Argued November 6, affirmed December 21, 1951; petition for
rehearing denied January 23, 1952

MILLER ET UX. *v.* PROTRKA ET UX.

238 P. 2d 753

*Bert McCoy* and *Cecil Stickney,* of Eugene, argued the cause and filed briefs for appellants.

*Windsor Calkins,* of Eugene, argued the cause for respondent. On the brief were Calkins & Calkins.

Before BRAND, Chief Justice, and HAY, ROSSMAN, WARNER and LATOURETTE, Justices.

WARNER, J.

This suit was brought by the plaintiffs, Joe Miller and Edith Miller, his wife, to foreclose a contract for the sale of a motel. The defendants, George Protrka and Anna Protrka, his wife, filed a cross-complaint seeking a rescission of the contract. They alleged fraudulent representations. From a decree of foreclosure in favor of the plaintiffs, the defendants appeal.

The Millers as the sellers and the Protrkas as the buyers entered into an agreement on the 5th day of

August, 1949, for the sale and purchase of what is known as Seal's Motel in Eugene, Oregon, and certain chattels used in connection with its operation for an agreed price of $125,000. The Protrkas made an initial payment of $25,000 and agreed to pay the balance by monthly payments of not less than $1,400, together with interest.

The Millers acquired the motel in December, 1947, and operated it continuously thereafter until they sold it to the Protrkas, who entered into possession on August 6, 1949. It is described as having 31 living units, one of which was reserved by the owners as quarters for themselves and occasionally one as quarters for the help. The remaining units were held for rental to the transient public.

Mr. Miller, prior to coming to Eugene, was engaged in the transportation business in Montana. Because of poor health he gave little attention to the operation of the motel and spent much of his time in Montana or Wyoming where the Millers owned other property. Mrs. Miller, a former schoolteacher, remained in Eugene where she gave her entire time and attention to the management of the motel property. It was she who was in charge of the records and various business matters incident to its operation.

On May 25, 1949, Mr. Miller, enroute to Montana, stopped in Portland long enough to list the motel for sale with G. E. Carlson, a real estate broker of that city. He then signed a commission contract and at the same time supplied Mr. Carlson with certain information concerning the motel and its operative history; but because of Mr. Miller's want of accurate information in this respect, Mr. Carlson later made personal contact with Mrs. Miller in Eugene. From her he secured more accurate data predicated upon the book

records which she had at hand. On June 11, 1949, this resulted in a new listing signed by both Mr. and Mrs. Miller which supplanted the earlier listing of May 25 signed by Mr. Miller alone.

Mr. Carlson advertised the motel for sale from July 6 to 8, 1949, inclusive, in the Oregonian, a daily newspaper published in Portland, Oregon. This advertisement carried the following statements upon which the defendants rely: "* * * Newly furnished and decorated last Feb. Did over $40,000.00 last 12 mo. * * * Hardly ever a vacancy * * *."

This advertisement came to the attention of the Protrkas for the first time on the date of its last publication and enlisted their interest in the property. They called and made an appointment with Mr. Carlson, who came to their home in Portland the same day. The Protrkas were then living in an apartment house which they owned and operated.

At that time Mr. Carlson handed them and they thereafter retained a typewritten memorandum entitled "Estimated Income—Seal's Motel—Eugene, Oregon (30 Rentals)." This statement, compiled by him with considerable detail from some data supplied by the plaintiffs, computed the rental return on 29 units at a reduced "winter rate" for five months and at an enhanced "summer rate" for seven months, with a total annual gross income of $56,700. This statement of "Estimated Income" was followed by an itemization of seven major expense items computed on an annual basis in the total amount of $13,486. According to Mr. Carlson's computation and as shown by his prepared memorandum, the annual net return from Seal's Motel was "$42,214.00." (Predicated upon the figures employed by Mr. Carlson, the estimated net return should read $43,214.) The defendants rely

heavily upon this memorandum to support their claim of fraud. We shall hereinafter refer to it as the "Carlson statement"

After the discussion between Carlson and the defendants at their Portland home on July 8, it was arranged that they would personally inspect the property in Eugene on July 12. Carlson drove them to Eugene and participated in the conversations which they then had on the occasion of their first meeting with the Millers. Their inspection of the premises resulted in the Protrkas making an earnest payment while then in Eugene. The next step of consequence and, as far as shown by the record, the second meeting had between the buyers and the sellers was in the offices of Commonwealth, Inc., in Portland where the deal was finally closed and the instant contract executed. The Protrkas took possession of the property the next day. They have been continuously in possession ever since.

On December 16, 1949, under the impression they had been cheated in their bargain by false and fraudulent representations made by the Millers and their agent Carlson in their behalf, the Protrkas addressed a letter to the Millers through their attorney indicating an intention to rescind the contract and demanding restitution of the monies which they had paid thereunder. This was followed by the Millers filing the complaint in this suit praying for a strict foreclosure of the instant contract. As the basis therefor the Millers alleged that the Protrkas had breached the contract by their failure to pay real and personal taxes due and payable in 1949 aggregating $1,261.80 and by reason of their failure to pay the monthly installment of $1,400 due and payable under the contract as of January 5, 1950. By their answer and cross-complaint, the

defendants Protrka sought to have the contract rescinded on the ground of false and fraudulent representations alleged to have been made to them by the Millers, which may be summarized as follows: That plaintiffs had wrongfully and falsely represented (1) that Seal's Motel had been making a profit in excess of $40,000 annually and that the gross receipts were $155 per day; (2) that the minimum rental for any unit was the sum of $4 per night; (3) that there was "hardly ever a vacancy" when, as defendants allege, there were many vacancies; and (4) that the motel was one approved and recommended by the Oregon State Motor Association so as to entitle it to use and advertise with an AAA sign, thereby indicating to the public that the said motel met certain specifications and standards as to equipment, respectability and cleanliness and as a device to assist in obtaining a high-class patronage.

As hereinbefore noted, the defendants Protrka seek a rescission of the contract of August 5, 1949. A suit for rescission is a disaffirmance or repudiation of the contract and not an affirmation of it as would be true in an action for deceit. Rescission is often granted where an action for deceit could not be maintained. The right of rescission does not, as the right to recover damages in a common-law action for deceit, depend upon fraud for, if the transaction were the result of a false representation of a material fact, it could not stand against the injured party's right to rescind, however honestly made. *Weiss v. Gumbert,* 191 Or. 119, 227 P. 2d 812, 819; *Sharkey v. Burlingame Co.,* 131 Or. 185, 197, 282 P. 546.

A person alleging fraud has the burden of proving the same by a preponderance of the evidence. *Blair v. McCool,* 136 Or. 139, 146, 295 P. 950, 298 P. 244.

The law never presumes fraud. It is never assumed on doubtful evidence. To the contrary, it must be established by proof clear, satisfactory and convincing. *Belanger v. Howard,* 166 Or. 408, 414, 112 P. 2d 1022; *Metropolitan Cas. Ins. Co. v. Lesher,* 152 Or. 161, 167, 52 P. 2d 1133; *Castleman v. Stryker,* 107 Or. 48, 60, 213 P. 436.

■ When the relation of vendor and vendee exists, the doctrine of caveat emptor applies unless there is some subsisting fiduciary relationship between the parties. *Howard v. Merrick,* 145 Or. 573, 579, 27 P. 2d 891. No such fiduciary tie is present here, nor is any claimed. The foregoing rule, therefore, becomes one of importance in guiding us to our final determination in this matter.

The charge of fraud relating to the absence of a license to use an AAA sign is so palpably without merit that it is unnecessary to discuss it, and we will proceed to a consideration of the other three items which, it will be observed, are more or less related in character in that they all bear on the motel's earning capacity.

The Protrkas rest their case primarily upon what they claim are the misrepresentations as to income reflected by the Carlson statement, the Oregonian advertisement and Carlson's assurances that the figures therein employed by him were from the Millers' books. They insist that they bought the motel upon the reliance that it was "taking in $56,000 a year" and $155 per day. This last amount, it will be observed, is the annual gross return of $56,700 found in the Carlson statement reduced to a per diem basis. It, therefore, follows that an expected return of $56,000 and a per diem return of $155, as claimed by the Protrkas, are substantially one and the same. It is the defendants' contention that the recital in the ad-

vertisement to the effect that the motel "did over $40,000.00 last 12 mo." referred to net income and not gross income. Mrs. Protrka said she asked Mrs. Miller if she could see the books on the occasion of her visit to the motel on July 12 but was met with the response that "there was no use of seeing the books because I had everything from the books." Mrs. Miller's version of that conversation is that she told the Protrkas the books were there and that they had nothing to hide.

Carlson was the principal spokesman for the Millers throughout all the negotiations. He sharply contradicts the Protrkas at all points. He claims that the statement prepared by him and left with the Protrkas was solely for the purpose of revealing the motel's future potentialities under proper management and was a statement looking to the future and not predicated upon the past. He claims that he never represented that the motel had a net income of $40,000 per year and that the statement appearing in the advertisement related only to gross income based upon his examination of the Miller books.

The foregoing is a summary of the essence of the testimony of the purchasers, the sellers and their agent Carlson. Fortunately, we are not dependent upon the statements of the interested parties in order to formulate our final judgment.

The testimony of Carlson respecting the motel's past income finds support in the book records of the Millers. We pause here to briefly outline the relatively simple character of their accounting system. Every tenant at the motel signed a registration card carrying the date, unit number and per diem price for the accommodation. When each tenant vacated and settled, an entry was made in a day book or daily register, giving

the tenant's name, the unit occupied and the amount paid therefor. The receipts for a given day were totaled for that day on a separate page in the daily register reserved for that day and then carried forward to a general ledger. This general ledger was in a specially simplified, printed form designed and installed by a national accounting agency as one especially adaptable to a business such as the Millers had. In this general ledger, on a separate page for each month, were posted the daily totals of receipts carried forward from the daily register. Here, too, are found in summary form the current business expenses for that month. The disbursements for such expenses were posted from the operator's checking account. Both income and expenses were cumulated as to previous months in a manner which permitted an easy determination of exactly the true condition of the business for any given fiscal year as of the date of the last entry of the last operating month in such year. This was the condition of the records before and after July 12. They reveal that for the twelve months immediately preceding the publication of the advertisement, that is, from July 1, 1948, to June 30, 1949, the motel had a gross income of $39,791.20. The $208.80 difference between this income record and $40,000 we deem too immaterial to successfully support any assertion of misrepresentation in this matter. Moreover, the record is clear, and it is undisputed, that during the fiscal period, particularly during the latter part of 1948 and months of 1949 up to the very close of July 12, the motel was undergoing renovations and repairs of a major magnitude which respondents in their oral argument say cost in the neighborhood of $25,000 to $30,000. The exact amount of such betterments is not an issue here and we make no attempt to verify it, for

we are satisfied that they not only entailed a considerable sum but that the nature of the improvements and the manner in which they were made were such that prospective and perhaps normal rental returns were reduced during that period by the necessity of continuously removing two or more rental units from the available list while certain renovations and repairs were being made therein. In other words, were it not for these repairs it would be fair to assume that the gross rental returns for that fiscal period would have been $40,000 or better. These renovations also explain another factor suggested by the defendants' answer, that is, the variant in unit rental rates shown by the Carlson statement and what, in fact, was actually charged for some units prior to July 12. Prior to the time that the various units were thus renovated and old furniture and equipment replaced with new, the Millers, as to such units, could not command the same higher rentals that were charged after their overhauling.

■ The Protrkas attempt to impeach this book record by inviting our attention to certain erasures in the day book appearing as the total of receipts for various days in the months of May, June, July and August of 1949, and the new totals substituted for the erased totals, which in some instances still dimly appear. It is defendants' thesis here for the first time that these changes evidence a studied effort to build up a fictitious gross receipts return favorable to the defendants. The Protrkas introduced the register in which the challenged erasures appear but did not question them during the trial. Erasures are not necessarily alterations in the legal sense of the word which per se impute a fraudulent design. It is perhaps sufficient to say that not only did the lower court examine the

challenged books, including the registration cards which are the basis for the entries made, without finding discrepancies but we, too, have made a similar examination here with the result that we find a satisfactory basis for each entry made in the register upon the days that defendants claim the books were altered for the purpose of misleading them. Moreover, an examination of the day-by-day totals for income received by the Millers in the corresponding period for the year 1948 gives further confirmation that the 1949 "erased" totals are in sufficient harmony with them to allay any suspicion as to their verity. For the foregoing and other reasons not necessary to recite here, we are of the opinion that defendants' claim of plaintiffs' scheme to deceive them by material alterations of their books of account is without merit.

 The defendants place their finger on the words "hardly ever a vacancy" as they appear in the Oregonian advertisement and assert that they are further evidence of fraudulent representations. "It is a broad generalization usually observed in cases involving issues of fraud attempted to be predicated thereon that commendatory language is not construed as importing a representation upon which a charge of fraud may be based." 23 Am. Jur., Fraud and Deceit, 791, § 33. The rule is well settled that mere general commendations of property which are the subjects of sale, sometimes called "trade talk," "dealers' talk," "sellers' statements" or "puffing," do not attain the status of fraudulent representations where the parties deal at arm's length, as here. 23 Am. Jur., Fraud and Deceit, 791, § 33; 37 C. J. S., Fraud, 241, § 13. Such statements usually are regarded as mere expressions of opinion upon which a purchaser cannot safely rely. *Stovall v. Newell,* 158 Or. 206, 208, 75 P. 2d 346; *Cripe*

*v. Wade,* 123 Or. 111, 114, 261 P. 72; *Bell v. Spain,* 110 Or. 114, 129, 222 P. 322, 223 P. 235. This is especially true when the prospective buyers have or can obtain equal means of information and are equally qualified to judge certain factors claimed to contribute to the value of the property offered for sale. To such statements the maxim of caveat emptor applies. *Horner v. Wagy,* 173 Or. 441, 455, 146 P. 2d 92; *Castleman v. Stryker,* supra, 107 Or. 55. When the form of a statement and the subject matter or the circumstances under which it was made are such that it cannot be fairly construed as anything but an expression of an opinion or belief, it is proper for the court to so hold. 37 C. J. S., Fraud, 452, § 124. Viewing the record of this transaction in its entirety, we are of the opinion that the assertion in the advertisement that there was "hardly ever a vacancy" did not attain a higher status than "dealers' talk" or "puffing." In so concluding, we are not unmindful of the fact that the Protrkas were at the time engaged in a generally similar business, that is, selling living accommodations to the public. *Horner v. Wagy,* supra, at page 458; *Castleman v. Stryker,* supra, at page 55. The record also tells us that some substantial degree of success attended their business operations, for we note that they were able to command funds or credit sufficient to make a cash down-payment of $25,000 on the contract on August 5, 1949. Whether this was entirely the fruit of apartment-house operations we do not know, but it represents to us that the Protrkas were endowed with some business acumen of substance and had enjoyed some profit from their enterprise, a part of which, no doubt, came from their apartment-house venture and which, in their opinion at least, qualified them to enter into a motel business of the physical size and

value of the one owned by the Millers with a sense of security that they were equipped to make it a profitable undertaking; nor are we unmindful that the Protrkas inspected the motel on July 12 with an opportunity to verify the history of its vacancies from the daily and revealing record kept by the Millers. A purchaser must use reasonable care for his own protection and cannot rely blindly on the seller's statements but must make use of his means of knowledge and, failing to do so, cannot claim that he was misled. *Baker v. Casey*, 166 Or. 433, 437, 112 P. 2d 1031. On the occasion of their first visit to the motel, the Protrkas had an opportunity to confirm the statements found in the advertisement if, in fact, they felt they were of persuasive importance as to the record of vacancies and income prior to the time of the published statement as well as the period subsequent thereto. They even later had an opportunity to investigate the record of such matters as to the three weeks which elapsed between their inspection of the premises in July and the final closing of the deal in August. The record, however, does not disclose that they did so. We also think it is noteworthy that Mrs. Protrka, in response to her counsel's question, denied that Mr. Carlson had ever made any representations concerning the status of the vacancies.

■ We revert again to the Carlson statement, the cornerstone of appellants' claim that they were misled to expect over $56,000 as an annual gross revenue return from the motel's operation. As we have hereinabove pointed out, this statement was headlined by Carlson as "Estimated Income" and so we believe it to be. Indeed, a casual study of its contents supports this conclusion. Anyone with the most rudimentary knowledge of arithmetic would quickly discern that the

gross rental returns at the various seasonal rates which add up to $56,700, the figure to which the Protrkas cling, are computed upon a 100 per cent rental basis, that is, no vacancies during the entire year. It is a matter of common knowledge that no hotel or motel depending primarily upon transient patronage, no matter how successfully managed, can expect, year in and year out, a continuously full house. Moreover, it is incompatible reasoning to accept this $56,700 figure connoting a 100 per cent rental of the units and at the same time claim to be misled by and make an issue of the Oregonian advertisement which implied that the motel was not occupied to its maximum extent during the entire year. In so doing, the Protrkas blow hot and cold at the same time. Their experience as apartment-house operators should have taught them that a 100 per cent tenancy was at least an improbable expectation, if not an impossible one, especially in a business which depends primarily upon a transient traffic of short-term accommodations.

We deem it significant that Mr. Carlson left his typed statement with the Protrkas the first day he called, thereby giving them ample time to analyze it or to subject it to the analysis of independent counsel of their own selection. They retained and, as disclosed by the record, did bring it to the attention of at least one person, Mr. Joseph T. Berry, whom they had known for years. Mr. Berry was an accountant with thirty years' experience and at the time was secretary-treasurer of the Fox Realty and Accounting Service of Portland. He testified that Mr. Protrka had come to his home the night before the Miller sale was consummated in August, 1949, and requested him "to be present and advise him or explain the papers that they were about to sign in connection with this transac-

tion.'' He joined the Protrkas the next day at the offices of Commonwealth, Inc., in Portland where and when the motel deal was closed. There, his principal contribution was to question whether payments of $1,400 per month could be made each month and, as he says, ''in questioning that this paper [the Carlson statement] was handed to me.'' It is evident to us that as an accountant he would not be in a position to expertly question the defendants' ability to pay that monthly sum unless he predicated it upon some figure of net earning other than the net figure reflected by the Carlson statement. It necessarily would have to be a figure considerably less than the $42,214 net income shown by the Carlson statement to warrant an assumption that the Protrkas could not pay $1,400 per month or $16,800, plus interest, on the contract debt out of an annual net return in excess of $40,000. This bit of advice by Berry to the Protrkas made before the examination of the Carlson statement confirms our belief that at the time of his observation, he and the Protrkas were relying upon an entirely different income figure from the $56,700 now claimed.

There is one remaining item in this controversy which merits comment. We refer to a document executed by the Protrkas on December 1, 1949. It, in our opinion, is one of considerable significance and so weakens the testimony of the defendants as to seriously impair our respect for their veracity. On that date they signed a commission contract with Mr. Carlson, wherein they listed Seal's Motel with him for sale at a price of $145,000, exactly $20,000 in excess of the price for which they purchased it approximately four months before. In this contract they described the property as having a gross rental return of $51,180, with operating expenses in the amount of $10,847 and

a net income of $40,223. That document, voluntarily executed by them at that time, goes a long way to negative their claims of fraud in this matter and also bespeaks their continued confidence and faith in the integrity of Mr. Carlson. If we accept the defendants' premise that the motel was misrepresented to them, notwithstanding the terms of the commission contract of December 1, 1949, then they are guilty of implementing machinery for the perpetration of a like fraud on other innocent persons. In *Belanger v. Howard,* supra, 166 Or. 408, the purchaser, Belanger, after discovering what he alleged to be the fraud of his seller, induced the seller to advertise the property for sale and in this advertisement made substantially the same representations concerning the property which he later alleged as the misrepresentation of his seller. Concerning this we said, at page 418:

"* * * He [Belanger, the purchaser] came to a court of equity claiming that he had been victimized. Nothing less than frankness should have been manifested by him. In his efforts to prove that he had been defrauded, he should not have come forth as a willing perpetrator of fraud upon others."

The defendants attempt to parry the impact of their December selling agreement with Carlson by the assertion that they were not aware of the actuality of the alleged fraudulent representations of the Millers until seven days afterward when, on December 7, they again called to their aid their friend, Mr. Berry, who on that date analyzed their accounting records and then advised them to retain counsel. Reason and experience recoil from accepting the timing of their discovery as true. Even though they may not have known on December 1 the full extent of the failure of their operation of the motel, if true, nevertheless with their

background of experience as the owners and operators of an apartment house, it certainly did not take them four months to learn that they were deriving gross income at a far lesser rate than $56,700 per year, that they were not taking in $155 per day or that their rentals did not measure up to the "hardly ever a vacancy" standard of the Oregonian advertisement. The discovery from their own operations of such discrepancies in the alleged representations of the sellers did not have to abide the calling of an accountant nor does defendants' position in this respect excuse or explain the glaring misstatements which are found in the commission contract they made with Mr. Carlson only seven days before.

■ The Protrkas were the operators of an apartment house at the time of the deal. They inspected the motel property before making an earnest money payment. They were not refused an opportunity to inspect the books, which were all on the premises at that time. Before signing the contract, they called Mr. Berry as their counsel. He was with them in the offices of Commonwealth, Inc., at the time they executed the contract and made their first payment thereon. The Protrkas were dealing at arm's length, there being no fiduciary relationship between them and the Millers. These circumstances preclude a successful charge of fraud. *Stiger v. Persyn,* 138 Or. 178, 181, 4 P. 2d 629.

It may be true that the Protrkas made an improvident bargain but, as was said in *Crouch, et al. v. Butler,* 119 Or. 344, 349, 248 P. 849: "* * * The courts cannot act as guardian for a man *sui juris,* who is competent to contract and who has every opportunity to satisfy himself of the extent and value of the property he is purchasing," and to which we add, the opportunity in this instance to verify the statements concerning

income from the sellers' elementary and quickly informing books of account.

■ In a suit or action springing from an alleged fraudulent transaction an appellate court, perforce of circumstances usually attendant upon a trial of such a case, must give much weight to the conclusions of the trial judge who had an opportunity to observe the principals and their demeanor on the witness stand, and so in this instance we receive with respect and persuasiveness the circuit court's holding "that the defendants have failed to show by a preponderance of the clear, satisfactory or convincing testimony or evidence that the plaintiffs ever falsely and fraudulently misrepresented any fact to the defendants or that the defendants were defrauded in the transaction." Such is also our conclusion.

The decree of the lower court is affirmed.