Argued and submitted November 14, 2002, judgment for fraud reversed; judgment for attorney fees reversed and remanded for further proceedings; otherwise affirmed on appeal and cross-appeal January 21, 2004

OREGON PUBLIC EMPLOYEES'
RETIREMENT BOARD,
as trustee, on behalf of the
Oregon Public Employees' Retirement Fund,
*Respondent - Cross-Appellant,*

*v.*

SIMAT, HELLIESEN & EICHNER,
a Delaware corporation;
Pamcorp Holdings, Inc.,
an Oregon corporation;
Pacific Aircraft Maintenance Corporation,
an Oregon corporation,
aka Pamcorp;
and Kenneth E. Kelley,
*Defendants,*

*and*

Michael T. REINBOLD
and David J. Simon,
*Appellants - Cross-Respondents.*

SIMAT, HELLIESEN & EICHNER,
a Delaware corporation,
*Third-Party Plaintiff,*

*v.*

OREGON INVESTMENT COUNCIL;
Oregon Department of Treasury;
and Oregon Department of Justice,
*Third-Party Defendant.*

SIMAT, HELLIESEN & EICHNER,
a Delaware corporation,
*Plaintiff,*

*v.*

PORT OF PORTLAND,
a municipal corporation,
*Defendant.*

9610-08259, 9802-01053; A107124

83 P3d 350

Barbee B. Lyon argued the cause for appellant - cross-respondent Michael T. Reinbold. With him on the briefs were Jeanne M. Chamberlain and Tonkon Torp LLP.

Joseph C. Arellano argued the cause for appellant - cross-respondent David J. Simon. With him on the briefs were Daniel L. Keppler and Kennedy, Watts, Arellano & Ricks LLP.

Jeffrey M. Batchelor, Special Assistant Attorney General, argued the cause for respondent - cross-appellant. With him on the briefs were Hardy Myers, Attorney General, Lisa A. Kaner, Special Assistant Attorney General, and Lynn R. Nakamoto, Special Assistant Attorney General.

Before Haselton, Presiding Judge, and Deits, Chief Judge,* and Wollheim, Judge.

HASELTON, P. J.

---

* Deits, C. J., *vice* Armstrong, J.

## HASELTON, P. J.

■      This complex, factually dense case concerns the construction of an aircraft maintenance facility at Portland International Airport (PDX) and the financing of a start-up company to operate that facility. Defendants Michael Reinbold and David Simon, developers of the combined project, appeal from a trial court judgment in favor of plaintiff, the Oregon Public Employees' Retirement Board (OPERB), which guaranteed the bonds that financed the project.[1] Plaintiff cross-appeals. On appeal, we: (1) reverse the judgment against both Reinbold and Simon on plaintiff's fraud claim; (2) affirm the judgment against Reinbold on the "milking"-based allegations of plaintiff's claim for shareholder liability; and (3) reverse and remand on Simon's counterclaim for attorney fees. On cross-appeal, we affirm the judgment in favor of Simon on plaintiff's claim for shareholder liability and, in light of our disposition of the shareholder liability claim against Reinbold on appeal, do not reach plaintiff's contingent cross-assignment of error challenging the judgment in favor of Reinbold on the "undercapitalization"-based allegations of plaintiff's shareholder liability claim.[2]

Plaintiff brought this action against Kelley, Reinbold and Simon (the Pamcorp principals), Pamcorp,[3] and Pamcorp Holdings, alleging claims for breach of contract and fraud. In addition, as pertinent here, plaintiff asserted a claim of "shareholder liability," alleging that Reinbold and Simon should be personally liable for the debts of Pamcorp and Pamcorp Holdings—that is, that the "corporate veils" of

---

[1] OPERB manages the Public Employees' Retirement Fund (PERF). The State Department of Treasury and the Oregon Investment Council (OIC) handle the investment of the funds.

[2] All of the members of this court participate in the Public Employees' Retirement Fund. This case involves the potential recovery of money by OPERB that could benefit the Fund. Thus, we conclude that a recovery by OPERB could have, at least in theory, a small impact on members' retirement accounts. In light of that conclusion, we invoke the "rule of necessity" in order to decide this case. *See generally Oregon State Police Officers' Assn. v. State of Oregon*, 323 Or 356, 361 n 3, 918 P2d 765 (1996) (court invoked "rule of necessity" to decide case involving Public Employees' Retirement Fund in which judges participated); *Hughes v. State of Oregon*, 314 Or 1, 5 n 2, 838 P2d 1018 (1992) (same).

[3] Pamcorp is referred to as "Pamco" in certain of the materials quoted below.

those entities should be "pierced"—because of defendants' alleged control and participation in "undercapitalization," "milking" of assets, and material "misrepresentations."[4] A default judgment was entered against defendants Pamcorp, Pamcorp Holdings, and Kelley.

The remaining claims were tried to the court. On plaintiff's fraud claim, the court entered judgment against both Simon and Reinbold for a total of $61,701,719, concluding that "plaintiff established actual reliance, that plaintiff's reliance was foolish, that it was unreasonable and unjustified, that reliance is an element of fraud, but that reasonable reliance is not an element of fraud." With respect to the shareholder liability claim, the trial court entered judgment in the amount of $34,518,000 against Reinbold for the debts of Pamcorp and Pamcorp Holdings, based on plaintiff's "milking" and "misrepresentation" allegations. However, the trial court entered judgment for Reinbold with respect to plaintiff's "undercapitalization"-based allegations of shareholder liability. Finally, the court entered judgment for Simon on the shareholder liability claim, concluding that plaintiff had failed to prove that Simon was a "controlling shareholder" of either Pamcorp or Pamcorp Holdings.

On appeal, both Reinbold and Simon assert that the trial court erred in entering judgment against them on plaintiff's fraud claim. Reinbold also argues that the trial court erred in holding him liable on the "milking" and "misrepresentation" bases of the shareholder liability claim. Plaintiff argues on cross appeal that the trial court erred in (1) entering judgment for Simon on the shareholder liability claim; and (2) granting summary judgment for Reinbold on plaintiff's alternative "undercapitalization" theory of shareholder liability.

Given the nature of defendants' assignments of error, and because plaintiff prevailed at trial, we generally state the facts material to our review of the appeal in the light most favorable to plaintiff. *Northwest Natural Gas Co. v. Chase Gardens, Inc.*, 328 Or 487, 490-91, 982 P2d 1117

---

[4] Plaintiff also alleged claims against Simat, Helliesen & Eichner (SH&E) that were settled before trial.

(1999). Nevertheless, to the extent that the trial court made specific factual findings—including findings *adverse* to plaintiff in some particulars—we are bound by those findings if supported by any evidence. Conversely, for purposes of our review of plaintiff's cross-appeal, we state the facts material to plaintiff's assignments of error in the light most favorable to defendants.[5]

In the late 1980s, defendant Kelley approached Barclay Associates, Inc.,[6] a real estate development firm, with an idea to build an aircraft maintenance facility at PDX. Defendants Reinbold and Simon, who worked at Barclay Associates, met with the Port of Portland (Port) and with the real estate development group at the State Department of Treasury (Treasury) and ultimately developed a proposal that the Oregon PERF would be a major investor in the project. As described more fully below, the early proposed investment structures varied, showing hangar construction costs of $16 to $35 million and working capital of $10 to $20 million. The proposals all showed total project costs in the range of $55 million.

In May 1990, Howard S. Wright Construction Company (HSW) provided Simon with an estimate for construction costs of the facility in the amount of $17,113,320.

In August 1990, the Pamcorp principals provided Treasury with a memorandum that stated the proposed investment structure as including $35 million for hangar construction, $10 million for equipment leasing, and $10 million working capital, for a total of $55 million. Under that proposal, it was clear that none of the working capital would come from profit on the sale of the hangars. That proposal did not go forward, and the parties continued to consider how to structure the deal. An October proposal suggested that some

---

[5] We do not understand the parties to argue that there is any fundamental factual inconsistency in the trial court's disposition of the matters that are the object of the appeal and cross-appeal, respectively.

[6] Barclay Associates, Inc., is a California real estate development firm owned in large part by Richard Barclay. Barclay Pacific Corporation, an entity created by Richard Barclay and the Pamcorp principals to build the project hangars, sell them to the Port, lease them back and then sublease them to Pamcorp, is a distinct entity that is a wholly owned subsidiary of Pamcorp Holdings, which is Pamcorp's parent company.

working capital would come from Barclay Associates from profits on the sale of the hangars but did not specify any amount.

In December 1990, representatives of OPERB, the Port, Pamcorp and Barclay Associates signed a letter of understanding that provided:

"1)   Barclay will enter into a ground lease for certain land (the 'Land') at AirTrans Center with the Port, and construct certain hangar improvements (mutually agreed upon by the parties) upon the land;

"2)   Barclay will lease the hangars and sublease the ground lease to Pamco for its operations, sell the hangars to PERS and/or the Port, and assign both the lease and ground sublease to the purchasers;

"3)   PERS and/or the Port will purchase the hangars from Barclay with the proceeds of Special Facility Tax Exempt Bonds issued by the Port with a letter of credit or other enhancement made by PERS;

"4)   *Barclay will make net proceeds from the hangar sale available to Pamco as working capital*[.]"

(Emphasis added.) That letter of understanding further provided that the anticipated purchase price of the hangar would be $40 million.

In early January 1991, the parties held a conference call that was summarized in a memorandum from Simon to the participants, including representatives of Treasury and the Port. That memo stated, in part:

"[The Port's attorney] was concerned that proceeds of a tax exempt issue must be used for acquiring assets and not for working capital. Our clear intent is that the improvements would be acquired in an arms length transaction utilizing bond proceeds to purchase the assets from the developer. Because the development group and Pamco have a certain degree of common ownership, it is probable that some of the developer's fungible assets will be invested as working capital for the operating company."

In March 1991, The Austin Company, a construction contracting firm, provided Kelley with an "Order of Magnitude Project Cost Estimate" that provided:

| | | |
|---|---|---|
| "Site Work | Allowance | $ 1,250,000 |
| "Hangar Shells | | $28,672,000 |
| "Shops & Office | | $ 2,880,000 |
| "Hangar Systems & Equipment | | $ 6,750,000 |
| "TOTAL ORDER OF MAGNITUDE COST | | $39,552,000" |

That estimate contained a note: "We recommend the owner add a 10% Contingency given the level of this guesstimate."

Also in March 1991, Reinbold contacted HSW, indicating that the Pamcorp principals were not considering other contractors for construction of the hangars and that they looked forward to working with HSW in constructing the hangars. Shortly thereafter, Simon began working with HSW on a design and budget, which showed a total cost for construction of the hangars and office of $17,891,504.

In April 1991, Treasury retained SH&E, an aviation consulting firm, to prepare a due diligence evaluation of the project. The Pamcorp principals met with Treasury, SH&E, and the Port and presented a business plan. Pamcorp's financial plan was described as "involv[ing] a prudent mix of public and private capital." The plan also showed that $20 million in capital contributions would be made by investors. At that meeting, Richard Murphy of SH&E asked about construction costs. Murphy testified that the Pamcorp principals told him that the "construction" cost would be about $40 million. The Pamcorp principals, in contrast, testified that they told Murphy that the "acquisition" cost would be $40 million. The trial court found that the Pamcorp principals "intentionally finessed" Murphy on that point, but did not tell "bald-faced lie[s]." When Murphy subsequently sought more detailed estimates on construction costs, Kelley sent Murphy the Austin Company report, which, as noted above, showed a projected construction cost of $39,552,000. In evaluating the project, Murphy considered the construction cost of about $40 million to be a key factor, and, had he known that the ultimate construction cost would be less than $25 million, he

would not have found the investment in the project to be reasonable. Murphy did not know that the Pamcorp principals expected to make a large profit from the sale of the hangars or that they planned for profits from the sale of the hangars to be used to provide the working capital necessary for the project.

The Pamcorp principals did not at any time provide to Treasury, SH&E, or PERF anything that showed the HSW estimates or the ultimate agreement with HSW to construct the hangars for a much lower cost than the estimate Kelley provided to Murphy. Simon instructed HSW not to disclose the construction cost to anyone and actively sought to prevent plaintiffs from discovering the construction costs.[7] Reinbold instructed his chief financial officer, Sego, not to tell plaintiff or SH&E the construction cost.

Murphy prepared SH&E's first evaluation of the project. That evaluation, dated April 12, 1991, provided the following summary of the project:

"1. The Barclay Group will finance and build the facilities at the AirTrans Center at PDX on property leased from the Port of Portland.

"2. After the facilities are built, Barclay will sell the facilities to the Port for approximately $40 million, and PAMCO will lease the facilities for a 30 year period. The hangar lease rate is proposed to be $3.8 million per year, with agreed rate escalations every three years.

"3. The Port will issue revenue bonds to finance the purchase of the hangars.

"4. The State of Oregon Public Employees Retirement Fund (PERS) would guarantee repayment of the bonds.

"5. PERS would receive payment for its guarantee from PAMCO lease payments on the hangar."

SH&E recommended that PERF make less than a full guarantee of the Port's bonds, based in part on the

_____

[7] Ultimately, the HSW contract was not included in the closing documents for the deal, although it was listed among the closing documents.

"[apparent high cost of the proposed maintenance facility and inability to verify the construction costs." The evaluation further noted that, at "approximately $40 million, the cost of the PAMCO hangar averages over $150 per square foot," which was higher than other recently constructed hangar facilities. The evaluation contained a cost estimate for the facility that was based on the March 1991 Austin Company report that built in the 10 percent contingency recommended by the Austin Company report, for a total construction cost of $40,563,000. The evaluation also contained an estimate of property taxes that was based on the assumption that the hangar facility would be worth $40,000,000. The evaluation was sent to Pamcorp as well as to Treasury.

In April 1991, Pamcorp was incorporated with Kelley, Reinbold, and Barclay as the only directors and Reinbold serving as chairman. Kelley became Pamcorp's President and CEO, and Simon became its Vice President, Secretary and Treasurer. Pamcorp's board ratified the acts of Kelley, Simon, and Reinbold taken before incorporation. Several days thereafter, Barclay Pacific Corporation was also incorporated. Richard Barclay was initially the only director, but he later resigned, and the Pamcorp principals became the board and officers of Barclay Pacific. Both companies ultimately became subsidiaries of Pamcorp Holdings, which was created the following year by the Pamcorp principals, who served as directors and owned the vast majority of its stock.

In May 1991, Simon sent to Treasury a summary of materials pertaining to the proposed financing arrangements of Pamcorp. That summary included a page indicating that Pamcorp would secure a construction performance bond for the project in the amount of $40 million.

Also in May 1991, one of Reinbold's tax advisors generated a memorandum concerning the tax ramifications of the project for Barclay. That memorandum shows that Reinbold and Simon contemplated Barclay Pacific selling the hangars to the Port for $40 million after constructing them at a cost of $17 million, then using a significant amount of the profits (over $10 million) to pay Reinbold, Kelley, and Simon "management fees"; Reinbold, Kelley, and Simon, as stockholders of Pamcorp, would, in turn, then lend those monies to

Pamcorp as start-up costs. Thus, under the version of the project then contemplated by the Pamcorp principals, none of those principals would put any of his own capital at risk in the project.

On June 27, 1991, all of the participants in the project signed a letter of intent. That letter indicated that the bond proceeds would be used for the construction and acquisition of the hangars, but did not indicate that Barclay Pacific would make profits from the sale of the hangars that would then be used to meet Pamcorp's obligation to provide working capital for the project.[8] Significantly, when the bond issue ultimately closed in July 1992, the July 1991 letter of intent, but not the December 1990 letter of understanding—which explicitly contemplated the use of "net proceeds" from the purchase as "working capital"—was included in the bond closing documents.

The next day, June 28, 1991, Murphy generated a supplemental report from SH&E to Treasury, which summarized the transaction as follows:

> "Revenue Bonds amounting to $48.2 million will be issued to fund the construction of a hangar facility at PDX. Approximately $40.0 million of the bond proceeds will be used to build the facilities with the remaining $8.2 million used for capitalized interest, debt service reserve and insurance costs."

In July 1991, the Oregon Investment Council, after reviewing the information contained in Murphy's June 28 report, approved PERS's participation in the project.

In December 1991, HSW sent Simon a preliminary construction cost estimate for the hangars in the amount of $23,314,258.75. Neither Simon nor any other Pamcorp principal provided that estimate to anyone at Treasury.

In January 1992, SH&E prepared yet another supplemental report in light of various details of the financing of the project that had been altered since its previous report. That report summarized the transaction as follows:

---

[8] Several amendments to the letter of intent were signed before the closing, but those also did not reveal either the expected profit on the sale of the hangar or that it would be used to meet Pamcorp's obligation to provide working capital.

"Taxable revenue bonds amounting to $50.0 million will be issued by the Port of Portland to fund the construction of a hangar facility at PDX. Approximately $38.5 million of the bond proceeds will be used to build the facilities with the remaining $11.5 million used for capitalized interest, debt service reserve and issuance costs."[9]

In February 1992, HSW gave Simon a guaranteed maximum estimate of construction costs of the project in the amount of $24,640,041. Again, that estimate was not disclosed to anyone at Treasury.

In May 1992, Pamcorp Holdings incorporated Reinbold, Simon, and Kelley owned all of the stock and acted as directors. Reinbold owned about 80 percent, Kelley about 15 percent, and Simon about 5 percent of the stock. Barclay Pacific became a wholly owned subsidiary of Pamcorp Holdings, and Pamcorp became a 95 percent owned subsidiary of Pamcorp Holdings.[10] At about the same time, Barclay resigned as a director of Pamcorp, and Simon was elected to its board.

In June 1992, Simon informed Murphy of SH&E that the "project fund will be approximately $36.625 [million] instead of $38.5 [million]." Murphy then sent an update to Treasury stating, in pertinent part:

"Taxable revenue bonds amounting to $50.0 million will be issued by the Port of Portland to fund the construction of a hangar facility at PDX. Approximately $36.6 million of the bond proceeds will be used to build the facilities with the remaining $13.4 million used for capitalized interest, debt service reserve and issuance costs."

Murphy, as well as SH&E's client, Treasury, believed that Reinbold and Barclay, as principals of Pamcorp Holdings, would be providing the working capital for the project. Treasury was not then aware that Barclay was no longer participating in the project.[11]

---

[9] Shortly thereafter, Murphy altered the evaluation at Simon's request to read, in pertinent part, that "[t]he Port of Portland * * * will make approximately $38.5 million available to Barclay Pacific for the purpose of acquiring and constructing the facility."

[10] The ownership of the remaining 5 percent is not material to any issue on appeal or cross-appeal.

[11] Meanwhile, also in June 1992, an aviation consultant retained by the Port to evaluate the project before issuance of the bonds reported that its understanding of

Thereafter, in June 1992, the necessary leases were executed and the bonds issued. The Port leased land at PDX to Barclay Pacific for construction of the hangars. The lease provided not only the payment terms, but provisions for Barclay Pacific to sublease to Pamcorp. The lease also obligated the Port to issue $50 million in revenue bonds and make the proceeds available to Barclay Pacific for construction of the hangars. Barclay Pacific was to build the hangars, deed the hangars to the Port, and lease the hangars back from the Port. Barclay was to sublease the entire project to Pamcorp. The lease agreements provided that Pamcorp shareholders who owned more than 5 percent of its stock would make available working capital for the project in the amount of $11 million in capital contributions or loans by the time maintenance operations would commence. The lease structure provided, ultimately, that Pamcorp would pay rent that would cover the cost of the bonds.

The Port issued $50 million of special obligation bonds, pursuant to an ordinance that authorizes the issuance of such bonds for acquisition or construction of hangars or other airport-related facilities. None of the bond documents stated the actual cost of construction of the hangars. PERF guaranteed the bonds.

Upon Barclay Pacific's receipt of bond proceeds, Reinbold paid himself, Richard Barclay, and Barclay Associates approximately $1 million to cover expenses and salaries that Reinbold and Simon had been paid while employed by Barclay Associates during the time the project was being put together and negotiated, thus leaving the Pamcorp principals with no money at risk in the companies related to the project. Reinbold also used part of the bond proceeds to settle a dispute with Barclay and buy out Barclay's interests in the various companies, thus terminating all relationships between the Pamcorp principals and companies (Pamcorp, Pamcorp Holdings, and Barclay Pacific) and Richard Barclay and his company, Barclay Associates, Inc. Finally, some of the proceeds were used to pay salaries to Reinbold and Simon that the trial court ultimately found to be unreasonably inflated.

---

the agreement was that "the Port has agreed to issue the Bonds and make the proceeds available to Barclay to construct the improvements."

The balance of the bond proceeds was used in part for construction of the hangers, and in part—via a pass-through from Barclay Pacific up to the parent company, Pamcorp Holdings, then down to Pamcorp—as working capital. The Pamcorp principals understood that they would need approximately $10 million in additional working capital in order for the project to succeed.

HSW began construction of the hangars in the summer of 1992. The Port paid Barclay Pacific $36.8 million for the hangars. Barclay Pacific made a profit of $12.1 million on the sale of the hangars.

Pamcorp began aircraft maintenance operations in September 1993. However, because it failed to attract investors interested in providing the additional working capital needed for a successful start-up, Pamcorp went out of business the following month.

Before September 1993, the problems with Pamcorp's lack of working capital were apparent. Pamcorp sought an additional $15 million in financing from PERF. Murphy at SH&E evaluated the situation for Treasury, and reported:

> "Approximately one year ago PERF made a $40 million investment in the PAMCORP facility with the understanding that PAMCORP was going to provide $11 million in working capital for the start-up venture. While PAMCORP principals have provided a portion of this into the company in the form of equity (approximately $6 million) they have been unsuccessful at raising conventional financing or equity participation from outside sources."

Murphy also noted that "PERF structured its original investment as a stand alone real estate deal which was separate and distinct from PAMCORP."

In October 1993, Murphy reported to Treasury his concerns about Pamcorp's financial management, noting that the existing Pamcorp shareholders were not willing to place capital at risk; that "it should have been apparent more than a year ago that Pamcorp would require more than $11.0 million in invested capital to successfully implement its plan, particularly with a requirement for $5.6 million to be set

aside as security for PERF and Port lease payments"; and that Barclay had withdrawn from the investment shortly before the bonds were issued, but the remaining principals did not seek another investor to replace Barclay. Murphy also noted that a "large portion of the capital contributed to PAMCORP was derived from profits earned on the development of the Hangar." PERF ultimately decided not to provide additional financing to Pamcorp. Pamcorp then breached its lease agreement, resulting in losses to PERF due to its guarantee of the bonds.

In October 1996, OPERB brought this action against the Pamcorp principals, as well as Pamcorp, Pamcorp Holdings, and SH&E. SH&E settled, and Pamcorp, Pamcorp Holdings, and Kelley defaulted. The court allowed defendants' motion for partial summary judgment against the "undercapitalization" allegations of plaintiff's shareholder liability claim. Thus, at the time of trial, the remaining issues were limited to the amount of damages to be awarded and Reinbold's and Simon's liability for fraud and for shareholder liability based on either "milking" of assets or material misrepresentation.

The case was tried to the court in December 1998. The trial court entered judgment against the defaulting defendants Pamcorp, Pamcorp Holdings, and Kelley in the amount of $34,518,000. With respect to fraud, the court determined that both Reinbold and Simon were liable and entered judgment in plaintiff's favor in the amount of $61,701.719. In rendering judgment against Reinbold and Simon for fraud, the court determined that "plaintiff has established actual reliance, that plaintiff's reliance was foolish, that it was unreasonable and unjustified, that reliance is an element of fraud, but that reasonable reliance is not an element of fraud."[12] The trial court determined that Reinbold was personally liable for the debts of Pamcorp and Pamcorp Holdings in the amount of $34,518,000, based on "milking" of corporate assets and "misrepresentation"—and that either of those bases was sufficient to support the imposition of full liability.[13] Conversely, the court entered judgment for Simon on

---

[12] Both Reinbold and Simon asserted counterclaims for attorney fees. The court necessarily rejected those counterclaims.

[13] *See* 191 Or App at 433 (quoting judgment).

the shareholder liability claim, determining that plaintiff had failed to show that he exercised the requisite control with respect to either Pamcorp or Pamcorp Holdings.

Reinbold and Simon appeal, and plaintiff cross-appeals. On appeal, Reinbold argues that the trial court's determination that he is liable for fraud was erroneous for any of several reasons, including: (1) contrary to the court's legal conclusion, reasonable reliance *is* an element of fraud; (2) he had no duty to correct plaintiff's and SH&E's misunderstanding about the cost of construction of the hangars; (3) the cost of construction was not material to plaintiff's ultimate decision to enter into the transaction; and (4) in all events, plaintiff did, in fact, know that the representations as to the cost of construction were false. With respect to shareholder liability, Reinbold argues that he cannot be liable based either on "misrepresentation" or "milking" of corporate assets. In particular, Reinbold asserts that, because plaintiff's evidence was insufficient to establish the elements of common-law fraud, it was also, necessarily, insufficient to establish misrepresentation of the sort required for piercing the corporate veil. Beyond that, Reinbold asserts that the evidence of "milking" was legally insufficient either because the disputed expenditures were not improper or because plaintiff failed to prove that any alleged "milking" did, in fact, cause plaintiff's losses.

Simon challenges the fraud judgment against him, raising arguments similar to Reinbold's. Simon also contends that, if he is not liable for fraud, and given the court's determination that he is not liable on the shareholder liability claim, the trial court erred in denying his counterclaim for attorney fees.

On cross-appeal, plaintiff assigns error to (1) the allowance of summary judgment against the undercapitalization-based allegation of the shareholder liability claim; and (2) the trial court's determination that Simon was not liable on the shareholder liability claim under any of the piercing allegations.

■    We turn first to defendants' liability for fraud. To prevail on a fraud claim, a plaintiff must show by clear and convincing evidence:

"(1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted on by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; (9) and his consequent and proximate injury."

*Conzelmann v. N.W.P. & D. Prod. Co.*, 190 Or 332, 350, 225 P2d 757 (1950). Although defendants assert that plaintiff failed to establish several of these elements by clear and convincing evidence, we need only address their argument concerning the trial court's holding that reliance need not be "reasonable reliance." As explained below, we conclude that the trial court was incorrect in its premise that the "right to rely" does not contain a reasonableness component. *See Meader v. Francis Ford, Inc.*, 286 Or 451, 456, 595 P2d 480 (1979) (to prove fraud, "[t]he representation must be *justifiably* relied upon by plaintiff in taking action or in refraining from it to his damage") (emphasis added).

■      Here, the trial court explicitly found, with respect to the fraud claim, that plaintiff's reliance on defendants' misrepresentations regarding construction costs was unreasonable:

"There's an unlimited amount of facts in this case that clearly show that there was information everywhere that any prudent person doing any reasonable level of due diligence would have been able to find that there was clearly a problem in the construction cost of this contract as compared to what the State thought it was. The state absolutely didn't do their due diligence. The state hired somebody without giving them proper direction. The people they hired, for which the state [is] responsible, did a very bad job. I consider this next to verging on gross negligence."

Nevertheless, the court concluded that plaintiff's failure to prove justifiable reliance was not fatal because, as a matter of law, "reasonable reliance is not an element of fraud." In particular, the judgment states:

"On plaintiff's claims arising from fraud, the Court found that plaintiff established actual reliance, that plaintiff's reliance was foolish, that it was unreasonable and

unjustified, that reliance is an element of fraud, but that reasonable reliance is not an element of fraud * * *."

In so holding, the court relied on the principle, expressed in various cases, that (in the trial court's words), "between somebody who makes misstatements and somebody who is an idiot, we are going to protect idiots."

Before addressing the substance of the trial court's analysis, we emphasize that the narrow question before us is *not* whether the trial court correctly determined that plaintiff's reliance in the present case was unjustified and unreasonable—plaintiff does not challenge the trial court's factual finding that plaintiff's reliance was "unreasonable and unjustified."[14] Rather, the question is whether the trial court erred in concluding that, as a matter of law, reliance need not be reasonable.

The primary case on which the trial court relied in reaching that conclusion was *Johnson v. Cofer*, 204 Or 142, 281 P2d 981 (1955). *Johnson* involved a claim for rescission of a contract. There, a buyer entered into a transaction to purchase a boarding house operation from the defendant. The buyer knew of a problem concerning licensure and also failed to ascertain from the owner of the property that he was willing to continue to rent it to the buyer on the same terms that he had rented to the defendant. *Id.* at 144-47. The buyer accepted the defendant's assurances that the problem with licensure had been taken care of and that the owner was willing to rent to the buyer. *Id.* at 147. The trial court allowed rescission, and the Supreme Court affirmed:

"This is a suit in rescission, that is, a disaffirmance of the contract by one of the parties asking that the agreement be entirely vitiated and the parties returned to the same positions in which they were prior to the execution of the agreement. The right of rescission does not depend upon fraud intentionally or negligently committed as does an action for deceit. * * *.

"It is a well established principle of law that in order to secure relief on the ground of fraud, the person claiming

---

[14] *See Horner v. Wagy*, 173 Or 441, 454, 146 P2d 92 (1944) (question of whether reliance is justifiable in totality of circumstances is a question for trier of fact).

reliance must have had a right to rely upon the representations. Generally speaking, the right to rely on representations presents the question of the duty of the party to whom the representations have been made to use diligence in respect to those representations. The courts are not entirely in accord as to the necessity of diligence at all where fraud has been employed, especially where representations are of a positive nature. 'The policy of the courts is, on the one hand, to suppress fraud and, on the other hand, not to encourage negligence and inattention to one's own interests. *The rule of law is one of policy. Is it better to encourage negligence in the foolish, or fraud in the deceitful? Either course has obvious dangers. But judicial experience exemplifies that the former is the less objectionable and hampers less the administration of pure justice. The law is not designed to protect the vigilant, or tolerably vigilant, alone, although it rather favors them, but is intended as a protection to even the foolishly credulous, as against the machinations of the designedly wicked.* It has also been frequently declared that as between the original parties, one who has intentionally deceived the other to his prejudice is not to be heard to say, in defense of the charge of fraud, that the innocent party ought not to have trusted him or was guilty of negligence in doing so.' 23 Am Jur 948, Fraud and Deceit, § 146."

*Id.* at 149-50 (emphasis added). The court concluded that "[i]n cases where the relief sought is that of rescission this court has adopted a policy that it is better to encourage negligence in the foolish than fraud in the deceitful." *Id.* at 151.

Defendants argue that *Johnson* was a rescission case, that it distinguished rescission based on fraud from an independent action for deceit (now generally known as fraud), and that the trial court erred in following it because the principle expressed there is limited to rescission cases. However, the case law does not support defendants' suggested distinction. While it is true that *Johnson* concerned rescission based on fraud, as did many of the cases that relied on it, both the Oregon Supreme Court and our court have also invoked *Johnson*'s "better to encourage negligence in the foolish than fraud in the deceitful" principle in discussing fraudulent conduct in regard to other types of claims. *See, e.g., Galego v. Knudsen,* 282 Or 155, 160, 578 P2d 769 (1978) (following *Johnson* in evaluating fraud claim); *Lilienthal v.*

*Kauffman*, 239 Or 1, 14, 395 P2d 543 (1964) (relying on *Johnson* concerning public policy on fraud in evaluating choice of law issue); *Caldwell v. Pop's Homes, Inc.*, 54 Or App 104, 114, 634 P2d 471 (1981) (relying on *Johnson* in case involving unlawful trade practices and fraud claims); *So. Sea. Auto Auction v. W. Cas.*, 41 Or App 707, 715, 598 P2d 1269, *rev den*, 288 Or 173 (1979) (citing *Johnson* in evaluating "right to rely" element of fraud).

Still, when understood in the larger context of the case law concerning fraud, neither *Johnson* nor any other Oregon decision has repudiated the requirement of "reasonable reliance" in fraud cases. Rather, those cases merely highlight that whether reliance is justifiable is to be evaluated in the totality of the circumstances.

*Coy v. Starling*, 53 Or App 76, 630 P2d 1323, *rev den*, 291 Or 662 (1981), is exemplary. There, the plaintiff, purchaser of a motel, sought damages for fraud based on a misrepresentation about the annual gross income and expenses of the motel. In concluding that reliance was not justified, we noted that the case involved an arm's-length transaction and that the plaintiffs were familiar with accounting and bookkeeping, yet declined to examine even the records that had been offered and provided by the defendants. *Id.* at 81. Moreover, the plaintiffs were aware that the defendants had owned the motel for less than a year and thus knew that the representation of annual gross income must have been an estimate. *Id.* We concluded that the defendants' representations were, in essence, expressions of opinion on which a buyer should not have relied, particularly where the buyers " 'have or can obtain equal means of information and are equally qualified to judge certain factors claimed to contribute to the value of the property offered for sale.' " *Id.* at 81-82, quoting *Miller v. Protrka*, 193 Or 585, 238 P2d 753 (1952). *See also Dept. of Transportation v. Hewitt Professional Group*, 321 Or 118, 895 P2d 755 (1995) (it was not reasonable to rely on representations about the likelihood of condemnation of property in light of notice that provided information concerning the topic); *Gregory v. Novak*, 121 Or App 651, 655, 855 P2d 1142 (1993) ("Justifiable reliance requires a 'right to rely,' which is acquired by taking reasonable precautions to safeguard one's own interests.").

■ Thus, notwithstanding some ostensible tensions, Oregon case law adheres to a consistent principle: Reliance in fact must be reasonable, but such reasonableness is measured in the totality of the parties' circumstances and conduct.[15] For example, if there is a naive and unsophisticated plaintiff on one side of the equation and an unscrupulous defendant who made active misrepresentations of fact on the other, a court might well conclude that, although a more sophisticated party would not have taken at face value the false representations of the defendant, *that* particular plaintiff was justified in doing so. In contrast, if a party is a large and sophisticated organization that has at its disposal a small army of attorneys, accountants, and hired experts to evaluate a business deal, that party, like the plaintiff in *Coy*, probably "ha[s] or can obtain equal means of information and [is] equally qualified to judge" the merits of a business proposition, thus making reliance on misstatements by another party unjustified. *Coy*, 53 Or App at 81-82.

■ In sum, the "right to rely" element of a fraud claim under Oregon law requires proof of the reasonableness of the reliance. The trial court erred in concluding otherwise.

In most cases, such an error would require a remand so that the factfinder, which misapprehended the elements of a claim, could reexamine the evidence, applying the proper legal standard. Here, however, such a remand is unnecessary and would be inappropriate. As noted above, the trial court made explicit and extensive findings on the fraud claim in support of its determination that plaintiff's reliance on defendants' misrepresentations was "unreasonable and unjustified." Consequently, given the trial court's findings, and

---

[15] We recently endorsed the similarly "holistic" approach in an analogous context. In *Pioneer Resources LLC v. D.R. Johnson Lumber Co.*, 187 Or App 341, 68 P3d 233, *rev den*, 336 Or 16 (2003), we addressed whether one contracting party's failure to review certain documents constituted "gross negligence," precluding reformation. In affirming the allowance of reformation, we observed:

"[I]n this context, 'gross negligence' is innately circumstantial and elastic. In particular, plaintiff's conduct cannot be assessed and characterized without reference to defendant's. For example, the fact that one party engaged in a course of conduct calculated to conceal and perpetuate the other's mistake necessarily informs our determination of whether the second party's failure to discover its mistake was grossly negligent—or even negligent at all."

*Id.* at 382 (footnote omitted).

because justifiable reliance is a necessary element of fraud, we reverse the trial court's judgment against Reinbold and Simon on the fraud claim.[16]

■■ We proceed to the parties' various arguments pertaining to shareholder liability. ORS 60.151 codifies the principle that "a shareholder of a corporation is not personally liable for the acts or debts of the corporation merely by reason of being a shareholder." However, shareholder immunity is not absolute. Rather, in carefully circumscribed circumstances, where no other remedy is adequate, courts may "pierce the corporate veil" and hold controlling shareholders personally responsible for the debts of insolvent corporations. In *Amfac Foods v. Int'l Systems*, 294 Or 94, 654 P2d 1092 (1982), the court defined the requisite for such piercing:

> "When a plaintiff seeks to collect a corporate debt from a shareholder by virtue of the shareholder's control over the debtor corporation rather than on some other theory, the plaintiff must allege and prove not only that the debtor corporation was under the actual control of the shareholder but also that the plaintiff's inability to collect from the corporation resulted from some form of improper conduct on the part of the shareholder. This causation requirement has two implications. The shareholder's alleged control over the corporation must not be only potential but must actually have been exercised in a manner either causing the plaintiff to enter the transaction with the corporation or causing the corporation's default on the transaction or a resulting obligation. Likewise, the shareholder's conduct must have been improper either in relation to the plaintiff's entering the transaction or in preventing or interfering with the corporation's performance or ability to perform its obligations toward the plaintiff."

*Id.* at 108-09. Thus, to pierce, the plaintiff must prove that (1) the defendant controlled the debtor corporation; (2) the defendant engaged in "improper conduct"; and (3) as a result of that "improper conduct," plaintiff either entered into a transaction that it otherwise would not have entered into or plaintiff was unable to collect on a debt against the insolvent corporation.

---

[16] That disposition obviates any need to address defendants' alternative challenges to the fraud judgment.

Here, Reinbold asserts that the trial court erred in holding him liable for the debts of Pamcorp and Pamcorp Holdings based on "milking" of corporate assets and "misrepresentation."[17] On cross-appeal, plaintiff argues that the trial court erred both in granting summary judgment against its "undercapitalization" allegations and in concluding that Simon was not liable for the debts of Pamcorp and Pamcorp Holdings.

■ For cogency—to "clear the decks" analytically—we first address the issue, raised on cross-appeal, of Simon's alleged shareholder liability. We conclude that the trial court was correct that Simon lacked sufficient control over Pamcorp or Pamcorp Holdings to be held personally liable for their corporate debts.

Plaintiff does not take issue on cross-appeal with the trial court's determination that Reinbold, not Simon, had control over the ultimate decision-making at Pamcorp and Pamcorp Holdings. Nevertheless, plaintiff urges that, in situations in which a shareholder such as Simon plays a substantial role in carrying out "improper conduct" by way of misrepresentation, that shareholder should not be immune from personal liability for the debts of the corporation caused by that improper conduct. In particular, plaintiff posits that, for purposes of piercing the corporate veil, the inquiry should be limited to whether the defendant had control over the *improper acts*, not whether the defendant had control over the *entire corporation*.

We disagree. Plaintiff's proposed approach misconstrues *Amfac*'s "actual control" requirement and impermissibly conflates the "improper conduct" and "actual

---

[17] We note that the parties and the trial court have treated each of the asserted three bases for finding "improper conduct" for piercing the corporate veil—misrepresentation, undercapitalization, and milking of corporate assets—as *separate* and *independently sufficient* bases for imposing shareholder liability, rather than addressing the evidence of all types of alleged "improper conduct" *together* in evaluating whether shareholder liability should be imposed. *See* 191 Or App at 431-33 (describing procedural posture). Because the parties have chosen to try the claim in this manner, we express no opinion as to the propriety of separating out the allegations as stand-alone bases for shareholder liability. *But see Gemignani v. Pete*, 187 Or App 584, 591-92, 71 P3d 87, *rev den*, 336 Or 16 (2003) ("improper conduct" is the theory on which piercing should be submitted to factfinder, not "corporate insolvency" or "undercapitalization").

control" elements. Under *Amfac*, shareholder liability can be imposed only in circumstances where "the debtor corporation was under the *actual control* of the shareholder." 294 Or at 108 (emphasis added). Here, Simon was both an active participant in the affairs of Pamcorp and an active participant in much of the conduct at the core of this case. However, he never held a significant interest in either Pamcorp or Pamcorp Holdings, and was not ultimately responsible for the financial decision-making of either corporation. In sum, Simon did not possess, or exercise, "actual control."

We note, moreover, that plaintiff's proposed approach—equating "control" over the alleged "improper conduct" with "actual control" of the corporation—would effectively delete the "actual control" requirement from the *Amfac* test. Presumably, one who engages in improper conduct has "actual control" over his or her own actions. Thus, plaintiff's formulation would collapse "actual control" into "improper conduct." We decline to do so.

We thus affirm the judgment for Simon on the shareholder liability claim. Given that disposition and given our reversal of the fraud judgment against Simon, we also reverse and remand for reconsideration the trial court's denial of Simon's counterclaim for attorney fees, as a "prevailing party," based on an agreement between Simon and plaintiff.

We turn, then, to the various assignments of error concerning Reinbold's liability for the debts of Pamcorp and Pamcorp Holdings. The focus of these assignments of error is not on "actual control," which Reinbold concedes that he had, but, instead, on "improper conduct" and causation. Reinbold contends, particularly, that the evidence was insufficient to establish either "milking" of corporate assets or misrepresentations that would permit "piercing the corporate veil."

Before addressing the substance of those challenges, it is important to clarify the procedural posture. Plaintiff's operative fifth amended complaint included, as its second claim for relief, a claim entitled "Shareholder Liability for Debts of Pamcorp Holdings and Pamcorp."[18] That claim, in

---

[18] In *Amfac*, the court characterized the "disregard of a legally established corporate entity" as "an extraordinary remedy," which "is limited by conditions and

turn, consisted of two counts, the first pertaining to piercing the corporate veil of Pamcorp, and the second pertaining to piercing Pamcorp Holdings' corporate veil. Reinbold and Simon were named as defendants to each count,[19] and both counts alleged that shareholder liability should be imposed because defendants had engaged in "improper conduct in exercising control over" the corporations, including by under-capitalizing each corporation, making "material misrepresentations and omissions," and "milking" corporate assets. Those allegations were not *pleaded* separately, as distinct grounds or specifications that could independently warrant piercing. Rather, the allegations pertaining to undercapitalization, misrepresentation, and milking were presented without differentiation as actionable "improper conduct."

Notwithstanding the manner in which the "shareholder liability" claim was pleaded, however, the parties proceeded to treat undercapitalization, misrepresentation, and "milking" as independently sufficient bases for imposition of shareholder liability. *See* note 17, above. For example, before trial, Reinbold successfully moved for partial summary judgment against the undercapitalization-related allegations.[20] At the close of the evidence, Reinbold moved pursuant to ORCP 54 B(2) for dismissal of all claims based on insufficiency of the evidence.[21] That motion explicitly challenged

---

limitations which are inapplicable" to other remedies. 294 Or at 103. Consequently, the court cautioned, "when a plaintiff seeks to impose liability upon a stockholder of a defaulting corporation, the plaintiff and the court must be careful to keep the theories of recovery scrupulously segregated." *Id.* at 103-04. In a related footnote, the court explained:

"The pleading should separately set forth each theory of recovery as a separate count. When more than one theory of recovery is pleaded, the trial court's instructions should make clear that the plaintiff is asserting separate theories of recovery, and the instructions, as to each separate theory, should be self-contained."

*Id.* at 104 n 12. *See also Gemignani,* 187 Or App at 591-92 (discussing pleading in the context of piercing the corporate veil).

[19] Kelley was also a defendant as to each count, and Pamcorp Holdings was a defendant as to the first count.

[20] The parties dispute whether the court actually withdrew its partial summary judgment on that issue, despite its entry of an order and recitation in the judgment to the contrary. Given our disposition below, we need not reach that question.

[21] Reinbold had previously made such a motion, albeit in abbreviated fashion, at the close of plaintiff's evidence.

the sufficiency of the evidence supporting the common-law fraud claim and the "milking" allegations of the shareholder liability claim, but did not expressly refer to the misrepresentation-related allegations of that claim. In context, though, it is apparent that all parties' counsel understood and treated the arguments pertaining to the alleged insufficiency of evidence of fraud as applying equally to misrepresentation-based piercing, *i.e.*, that the substantive elements of the two were the same.

Ultimately, the trial court, like the parties, treated the different types of improper conduct as separate and independently sufficient bases for imposing shareholder liability. In particular, the court specified in separate paragraphs of the final judgment that "[p]laintiff has judgment against defendant Reinbold * * * for shareholder liability for the debts of Pamcorp Holdings and Pamcorp arising from milking corporate assets," and that "plaintiff has judgment against defendant Reinbold * * * for shareholder liability for the debts of Pamcorp Holdings and Pamcorp arising from fraud."

That procedural posture circumscribes our review of the merits in one critical respect: Whatever the procedural propriety of separately adjudicating the undercapitalization, misrepresentation, and "milking" allegations of improper conduct,[22] Reinbold does not dispute that affirmance with respect to *either* "milking" or misrepresentation would yield full shareholder liability of $34.5 million. Thus, if we affirm as to one, we need not consider the other.

■ With the procedural stage so set, we turn to Reinbold's argument that the trial court erred in piercing the corporate veil based on allegations that he "milked" Pamcorp's corporate assets. The assets in question amounted to approximately $2 million. Reinbold's argument is twofold: (1) the disbursement of those assets was not improper; and (2) in any event, the disbursement of the $2 million did not cause plaintiff's loss. Based on our review of the record concerning Reinbold's justifications for the various pay-outs that comprised the disputed $2 million, we reject without further

---

[22] *See* 191 Or App at 430 n 17.

discussion his assertion that there was nothing "improper" about those disbursements individually or collectively. We turn, then, to the sufficiency of plaintiff's evidence of "milking"-related causation.

In assessing causation, the trial court reasoned, based on plaintiff's evidence, including expert testimony, that the greater a company's assets, the more attractive it is to investors. Thus, the court determined that Reinbold's depletion of $2 million of Pamcorp's assets reduced the company's chance of obtaining the level of necessary financing (an additional $10 million) from approximately 40 percent to approximately 35 percent. Before reaching its ultimate conclusion that that difference would materially affect the prospects of outside investment, the court outlined its reasoning:

> "Now, the big question in my mind, after you and I get through deciding what should or shouldn't be in that thing, is at what point did taking any money out of the company, even for a legitimate prior business expense, so reduce the company's ability to get a loan that it can be considered milking with the disastrous consequences for your client that milking results in?
>
> "\* \* \* \* \*
>
> "No, I found the $2 million dollars. What I found is that a loan reduced it by six percent, five percent, from 40 to 35 percent likelihood in and of itself that they would get the loan. Not an enormous difference, but a difference. What I haven't done is drawn the legal conclusion. I've intentionally done it that way and actually put a number on it so when the Court of Appeals looks at this we don't have to do this over again. Either they think that the numerical submission of my analysis of the evidence constitutes materiality or it doesn't.
>
> "I've met with two judges who, as a matter of fact, disagreed on that very topic at lunch today. We know it's a close call, and I believe it's a very close call on materiality. I think that's just the way it was in reality. I'm not prepared to do that yet. I will pull the trigger on that to make a final conclusion."

Ultimately, in the judgment, the court "pull[ed] the trigger" by imposing liability for "milking."

On appeal, Reinbold argues that a five percent difference cannot demonstrate causation, in that that difference would not materially affect the prospect of securing the necessary outside investment. Plaintiff responds that the difference is not five percent but, instead, the ratio between 35 and 40 (one-eighth)—and, in all events, that that difference was sufficiently significant to materially affect the potential for outside investment and, consequently, of corporate liability and long-term solvency.

With respect, the parties' mathematical pilpul,[23] while engaging as an abstract exercise, largely misses the practical point: In the real world of investment, did the reduction of $2 million in assets materially affect the corporation's prospect of attracting an additional $10 million in investment, so that it could ultimately have been able to pay its corporate debt?[24] In that connection, it must be emphasized that plaintiff's "milking" causation theory is *not* that, but for the "milking," the $2 million would have been available to pay off Pamcorp's debt. Indeed, it appears to be undisputed that, if those funds had been retained, they would have been used to pay operating expenses, allowing the company to continue operations for a slightly longer period. Nor is it disputed that the $2 million would not have been enough to keep the business from failing. Rather, plaintiff's materiality/causation argument, which the trial court accepted, was that the presence of an additional $2 million on the corporate balance sheet, coupled with the fact that the initial principals had left their money in the company rather than repaying themselves with part of that $2 million, would have materially improved

---

[23] An authoritative source defines "pilpul" as follows:

"1. An inflated form of analysis and debate used in Talmudic study: i.e., unproductive hair-splitting that is employed not so much to advance clarity or reveal meaning as to display one's own cleverness.

"2. (Colloquially) Any hair-splitting or logic-chopping that leaves the main boulevard of a problem to bog down in the side streets."

Leo Rosten, *The Joys of Yiddish* 287-88 (1968).

[24] For example, if a company's likelihood of attracting further investment before "milking" was three percent, and was one percent after "milking," plaintiff would characterize the difference as "67 percent," and defendants as "two percent." But neither quantification, in isolation, is dispositive of materiality and related causation.

the likelihood of Pamcorp attracting an additional $10 million in investments—and that, in turn, would have materially affected the likelihood of the corporation surviving and meeting its obligations, including its obligation to plaintiff.[25]

■      We acknowledge, as the trial court understood, that the determination of materiality—and, by extension, of causation—in cases like this can seem to partake of "We know it when we see it" jurisprudence. Nevertheless, those determinations are generally committed to the trier of fact. *See, e.g., Loewen v. Galligan*, 130 Or App 222, 242, 882 P2d 104, *rev den*, 320 Or 493 (1994) (materiality is an objective question that can be answered as a matter of law only when reasonable persons could not differ); *Everts v. Holtmann*, 64 Or App 145, 151, 667 P2d 1028, *rev den*, 296 Or 120 (1983) (only if reasonable minds cannot differ is materiality appropriately resolved as a matter of law). Thus, for Reinbold to prevail, he must demonstrate that no reasonable trier of fact could have found "materiality" and consequential causation under these circumstances.

Reinbold's baseline contention is that, as a matter of law, plaintiff could not demonstrate causation because, even without "milking," Pamcorp's likelihood of securing the necessary investment was less than 50 percent:

"Plaintiff had the burden of establishing by a preponderance of the evidence that this $2 million in payments *caused* the $34.5 million loss reflected in the judgment. Preponderance means that the evidence must be more than equally balanced. Preponderance means it has to be 50%—plus a little more.

"Judge Keys' percentages tell us that plaintiff fell short of the 50% mark. They tell us there was already a 60% probability that Pamcorp was never going to get the financing it needed anyway, even if [it] had kept the $2 million. It was

---

[25] We reiterate that, given the parties' segmentation of the shareholder liability claim, *see* 191 Or App at 431-33, our inquiry in reviewing the denial of the Rule 54(B) motion against the "milking"-related allegations is *not* whether shareholder liability should be imposed based on the totality of Reinbold's conduct viewed as a whole. Rather, we focus solely on whether the alleged "milking" substantially "caus[ed] the corporation's default on the transaction or a resulting obligation." *Amfac*, 294 Or at 109.

therefore more probable than not that the $2 million payment did not cause the failure of the business, and therefore did not cause plaintiff's loss."

(Citation omitted; emphasis in original.)

■ That "50 percent" argument is, like many "bright-line" solutions, initially attractive.[26] Nevertheless, it fails for any of several reasons. First, Reinbold never raised that "50 percent" argument in moving for the Rule 54 B(2) dismissal. Although the court and parties in colloquy explored when a reduction in investment prospects was sufficiently great to be deemed material, *see* 191 Or App at 434-35, Reinbold never argued that, as a matter of law, if the corporation's "premilking" likelihood of attracting the necessary investment was less than 50 percent, then any amount of "milking," no matter how egregious, was not actionable because plaintiff could not establish the requisite causation. Instead, Reinbold's causation argument was limited to asserting that, even if the court were to find that some of the $2 million was improperly disbursed, that would not have materially affected an investor's decision. That is, Reinbold's counsel and the court focused on the significance of the "40 percent vs. 35 percent" difference; the present—and qualitatively different "50 percent" threshold argument was never mentioned. Thus, Reinbold's present contention was unpreserved. *See, e.g.,* *State v. Wyatt*, 331 Or 335, 343, 15 P3d 22 (2000) ("[A] party must provide the trial court with an explanation of his or her objection that is specific enough to ensure that the court can identify its alleged error with enough clarity to permit it to consider and correct the error immediately, if correction is warranted.").

Second, even if Reinbold's "50 percent" contention could somehow be deemed to be properly before us under the *Hitz* taxonomy,[27] we reject it. That contention evinces an artificially restrictive construct of causation that is irreconcilable with the equitable underpinnings of the "piercing" remedy.

---

[26] In fact, the argument is a "50 percent-plus" argument—that is, that the "milking" is not actionable unless Pamcorp had a *probability* of obtaining the necessary financing but for the "milking."

[27] *State v. Hitz*, 307 Or 183, 188, 766 P2d 373 (1988).

*See Amfac*, 294 Or at 103-04. If Reinbold were correct, a controlling shareholder's defalcations could destroy a company's substantial, but not predominant, likelihood of survival and success, and corporate creditors would have no recourse. If, for example, a company had a 49 percent—or even 50 percent, *see* 191 Or App at 437 n 26—likelihood of obtaining essential financing, and a controlling shareholder's "milking" reduced that likelihood to one percent, under Reinbold's formulation there could be no "milking"-based shareholder liability because there was no "causation." Reinbold cites no shareholder liability precedent for that proposition, and we decline to adopt it.

We thus conclude that the trial court properly denied Reinbold's Rule 54 B(2) motion against the "milking"-based allegations of shareholder liability. Consequently, we affirm the judgment for plaintiff on the "milking" allegations. That disposition, in turn, obviates any need to address either Reinbold's arguments that he is not liable on the alternative "misrepresentation"-based allegations of shareholder liability. For the same reason, we need not address plaintiff's contingent cross-assignment of error challenging the judgment for defendants on the "undercapitalization" allegations of shareholder liability.

In sum, we reverse the fraud judgment against both Simon and Reinbold. We affirm the judgment against Reinbold for shareholder liability based on "milking" of corporate assets. We affirm the judgment for Simon on all allegations of shareholder liability. And we reverse and remand Simon's counterclaim for attorney fees for further proceedings.

Judgment for fraud against appellants reversed, judgment against appellant Simon's counterclaim for attorney fees reversed and remanded for further proceedings, otherwise affirmed on appeal; affirmed on cross-appeal.