Argued March 3, affirmed April 13, 1955

# JOHNSON ET UX. *v.* COFER
## 281 P. 2d 981

*Stuart W. Hill* and *Lamar Tooze,* of Portland, argued the cause for appellant. On the brief were Tooze, Kerr, Hill & Tooze.

*A. C. Allen,* of Portland, argued the cause for respondents. On the brief were Allen & Roberts.

Before WARNER, Chief Justice, and ROSSMAN, LUSK, BRAND, LATOURETTE and PERRY, Justices.

PERRY, J.

This is a suit for the rescission of an executed agreement whereby the plaintiffs conveyed a parcel of real estate in the city of Portland to the defendant, and the defendant conveyed to the plaintiffs the furniture and equipment used in the operation of the Norris Hotel in Portland. The trial court granted the plaintiffs' prayer for a rescission and the defendant has appealed.

The facts in this case disclose that the defendant is a licensed real estate dealer in the city of Portland and has been operating rooming house properties in that city for a considerable length of time. The defendant originally leased the Norris Hotel for a period of years from the owner of the real property, Ben Medofsky. Sometime during the defendant's occupation as lessee of the premises she had altered the rooms on the second and third stories to arrange 32 apartments,

but did not obtain from the city the necessary permits for such alterations. At the time the plaintiffs first became acquainted with the defendant, the lease between the owner Ben Medofsky and the defendant had expired, and the defendant had the use of the premises on a month to month basis.

On October 25, 1951, the defendant was advised by the city of Portland that the alterations made for housekeeping rooms did not comply with the city code which required basement ceiling protection, proper stair enclosures, wall and ceiling coverings, solid slab doors on all openings into public corridors, proper wall and ceiling coverings between commercial occupancies and the apartments, proper plumbing facilities, proper yard areas, light and ventilation in kitchens and bathrooms, and a statement that there were other violations not specifically listed. It appears that this notice was the result of an inspection made relative to a fire that had occurred on the property, and the defendant and Medofsky were seeking a permit to repair the damage caused by the fire.

In November, 1951, the defendant received a communication from the city which stated that an examination of the premises "reveals no apparent effort made to discontinue the illegal use of the hotel as 32 apartments", and further calls attention to the fact that no effort had been made to bring the occupancy of the building in compliance with city regulations as had been agreed, and unless compliance was had no permit would be granted to operate the building even as a hotel. However, in some manner the defendant managed to obtain a hotel license.

In May, 1952, in answer to a newspaper advertisement offering to sell the operation of the Norris Hotel for housekeeping rooms, the plaintiffs contacted the defendant. The defendant did not personally show the

premises to the plaintiffs, but a niece of the defendant did. The plaintiffs stated they were interested in operating the premises for housekeeping rooms, and with the niece went to the premises for the purpose of taking an inventory of the furnishings belonging to the defendant. While they were present and looking through the building a city fireman appeared. The plaintiff Mrs. Johnson testified to that incident as follows:

"A  Yes. This fireman was there and they were discussing a permit or a license, we didn't know what it was, and he didn't—I don't think he saw us, because we didn't talk to the fireman, but he was discussing it with this girl that was staying there taking care of the place, and it was an argument over that he wouldn't O.K. a license.

"Q  You heard that?
"A  I hear [sic] them talking in the hall over this permit or this license, that he wouldn't O.K. it. So we just changed our mind. We said if there was trouble, if we couldn't get our permit, we didn't want to have it. So we didn't even take any more inventory that day, because we knew we couldn't get a permit, we couldn't run it. So we just quit and told them the deal was off."

And the plaintiff Mr. Johnson testified as follows:

"Q  Well, were you—did you do any talking to this fireman?
"A  No, we didn't talk to him at all. We were down in the hall a ways and here came that fireman up and, of course, he met Mrs. Cofer's niece there and he was talking to her and we kind of overheard them talking about a license, that we couldn't operate without a license, or couldn't get a license. And from there I don't know what took place because we gave up then; we didn't want to take it over if they were going to have trouble like that.

"* * * * *

"Q  Why is it that you didn't consummate the deal in May, 1952, Mr. Johnson? What made you call off the transaction?

"A  Well, it was all on account of that fireman that came up there and talked to Mrs. Cofer's niece.

"Q  He said there couldn't be housekeeping rooms?

"A  Yes."

This incident having occurred, the plaintiffs were no longer interested and left on a trip of about six weeks duration. Upon their return they were advised by the defendant that she had made some repairs and added some new equipment, and the plaintiffs were again interested. They made several inspections of the premises and again inquired concerning the license to operate the place. As to this, Mrs. Johnson testified as follows:

"A  So I asked her then, at the time that we talked, about the fireman, about the permit. She said that she had a license.

"Q  Had what?

"A  That she had a license for us to operate the place, and that we could use her license until we got one of our own. I asked her why, how about this fireman, why he had told her there was no permit on the place. She said it was all personal prejudice; that he wanted—he didn't want us to go in there, but he wanted to have it and run it as a bawdy house.

"Q  The fireman said that?

"A  Mrs. Cofer said the fireman wanted to rent that building for himself and run a bawdy house in it.

"Q  A bawdy, b-a-w-d-y (spelling) house.

"A  That is what he said then, and that was his personal feelings between him and her, that he was up there.

"Q What did she tell you about having everything arranged at the city hall, about the place?

"A She said she was also going to put this fireman off the beat; that he caused her trouble and he visited with all the tenants, he knew them all by name, and she said she was going to have him put off the beat. And in the meantime, when we got back she said he wasn't even on that beat any more.

"* * * * *

"Q Did you talk to Mr. Medofsky at all before you bought the place?

"A Never. She just told us she would—we asked about getting a lease on the place and she told us we would be better off renting it month to month and that she would call Medofsky herself, which she said she did, and she recommended us and he stated it was all right if we paid the $400 a month rent, it was all right if we took it over. So we never got to talk to Medofsky at all.

"Q Did you make any investigation at the city hall in the fire marshall's office or building inspector's office on this matter?

"A No; because after she told us it was all just personal feelings between her and the fireman and that she had this license posted in the hall, we thought that it was all run on the level, that there wasn't anything wrong with it.

"* * * * *

"Q Now, all the time while these negotiations were going on, the first time and the second time, and after you had heard the conversation of Mr. Stockdale, you didn't make any inquiry from the City of Portland as to the condition of the premises? Is that correct?

"A That is correct. I relied on her."

The evidence discloses that Mr. Medofsky was not contacted by the defendant on behalf of the plaintiffs, and that he knew nothing of their tenancy until Mrs. Johnson called and requested to have a boiler repaired.

On the 19th day of July, 1952, the plaintiffs conveyed a residence property to the defendant, and received in exchange therefor the defendant's operation of the Norris Hotel and the equipment therein, plaintiffs taking possession of the building at that time. Six days later city officials tacked upon the doors of the various tenants in the building a notice which read as follows:

"City of Portland, Oregon
DEPARTMENT OF FINANCE
Bureau of Buildings

NOTICE OF ILLEGAL OCCUPANCY
(Owner)—Ben Medofsky—917 S. W. Oak Street
(Tenant) A. L. Johnson     Address 1635 S.W. Alder St.
Location of violation

Notice is hereby given that this third story and second story is illegally occupied and must be made to conform to the Housing and Building Codes of the City of Portland or vacated. Within 30 days, the owner or agent must file with the Bureau of Buildings a written agreement to make the necessary corrections or to vacate the third story and second story. The following conditions make this occupancy illegal: Absence of required fire protection such as: basement ceiling protection, proper wall and ceiling covering throughout the entire building, using wood frame, 3-story building as an apartment house, lack of required plumbing facilities in each apt. Numerous other violations.

Date July 25, 1952          Inspector C. C. Crank."

Shortly thereafter the plaintiffs tendered a return of the consideration they had received to the defendant, and requested a rescission of the agreement.

The plaintiffs allege that the fraud consisted of representing (1) that the Norris Hotel could be used for housekeeping rooms, (2) that the plumbing and furnace in the building were in good condition, (3) that

the operation of the hotel produced an income of $900 per month, and (4) that for the purpose of inducing the plaintiffs to enter into the transaction the defendant wilfully planted tenants in the building to mislead the plaintiffs as to the extent of its occupancy.

One of the defendant's contentions is that the plaintiffs, having been previously placed upon their guard by having knowledge that a city fireman had objected to the present occupancy of the building in May, 1952, could not rely upon the truth of the representations made by the defendant that the premises could in fact be so occupied. The defendant asserts the plaintiffs could not rely on the statements that the plaintiffs could use her license, or that the matter was purely personal between herself and the officer, and having had notice of difficulty in advance they were bound to make an investigation to learn the truth.

■ This is a suit in rescission, that is, a disaffirmance of the contract by one of the parties asking that the agreement be entirely vitiated and the parties returned to the same positions in which they were prior to the execution of the agreement. The right of rescission does not depend upon fraud intentionally or negligently committed as does an action for deceit. The contract may be vitiated either by a positive fraud actively or negligently practiced, or it may be vitiated if its consummation was accomplished through a completely innocent representation of a material fact which proved false, but was relied upon as true and except for believing in its truth the party would not have entered into the agreement. *Schuler et ux. v. Humphrey et ux.,* 198 Or 458, 257 P2d 865; *Miller et ux. v. Protrka et ux.,* 193 Or 585, 591, 238 P2d 753; *Weiss and Hamilton v. Gumbert,* 191 Or 119, 227 P2d 812, 228 P2d 800.

■■ It is a well established principle of law that in order to secure relief on the ground of fraud, the person

claiming reliance must have had a right to rely upon the representations. Generally speaking, the right to rely on representations presents the question of the duty of the party to whom the representations have been made to use diligence in respect to those representations. The courts are not entirely in accord as to the necessity of diligence at all where fraud has been employed, especially where representations are of a positive nature. "The policy of the courts is, on the one hand, to suppress fraud and, on the other, not to encourage negligence and inattention to one's own interests. The rule of law is one of policy. Is it better to encourage negligence in the foolish, or fraud in the deceitful? Either course has obvious dangers. But judicial experience exemplifies that the former is the less objectionable and hampers less the administration of pure justice. The law is not designed to protect the vigilant, or tolerably vigilant, alone, although it rather favors them, but is intended as a protection to even the foolishly credulous, as against the machinations of the designedly wicked. It has also been frequently declared that as between the original parties, one who has intentionally deceived the other to his prejudice is not to be heard to say, in defense of the charge of fraud, that the innocent party ought not to have trusted him or was guilty of negligence in so doing." 23 Am Jur 948, Fraud and Deceit, § 146. See also *Larsen et al. v. Lootens et al.,* 102 Or 579, 194 P 699, 203 P 621.

■ This case reveals that the plaintiffs were inexperienced in this type of business transaction, while the defendant was experienced. The defendant knew that the time for the operation of the building as a rooming house was drawing swiftly to a close unless she or Medofsky, the owner of the building, made necessary repairs and adjustments. She knew what these repairs and adjustments were. She also knew that it

was not economically feasible for a tenant to make all of the necessary repairs and adjustments so that the premises could be occupied for housekeeping rooms, and that Medofsky apparently would not make the repairs. She knew that it was mainly the continued operation of the building as housekeeping rooms, and not the personal property, that would be the moving factor in inducing the plaintiffs to enter into an agreement. Having represented to the plaintiffs that the premises would and could be occupied for housekeeping purposes, it was then her duty to fully disclose these facts to the plaintiffs.

Mr. Justice Burnett in *Palmiter v. Hackett,* 95 Or 12, 17, 185 P 1105, 186 P 581, stated:

"* * * when a defendant opens his mouth to make declarations respecting the property involved, he must speak the whole truth * * *."

5. In cases where the relief sought is that of rescission this court has adopted a policy that it is better to encourage negligence in the foolish than fraud in the deceitful. As to this policy we have said: "We think that both morally and legally there is wholesome doctrine in the words of Mr. Justice Burnett in *Caples v. Morgan,* supra, 81 Or at p. 702:

" 'If demonstrable falsehood has been used to induce the execution of a contract in a manner calculated in the judgment of a jury to influence the decision of a reasonably prudent man under all the circumstances, it is sufficient to defeat the agreement at the election of the injured party. * * * It is wrong to lie, and a person who has thus set a trap for the other party cannot be heard to complain that the latter should not have walked into the snare. It better comports with common honesty to condemn faleshood as a means of constructing a contract.' "

*Hansen v. Holmberg,* 176 Or 173, 184, 156 P2d 571.

■ In addition to the direct representations, the evidence quoted herein, which was believed by the trial court, shows a steady course of action pursued by the defendant to dissuade the plaintiffs from making contact with the city or with the owner of the property so that the true status of the operation of the building would be known. There can be no question that the plaintiffs did rely upon the statements of the defendant, for we cannot be led to believe that the plaintiffs would have parted with real property from which there is a substantial rental return for a business that was valueless. The record before us conclusively shows that the plaintiffs were the victims of a fraudulent design of the defendant.

We do not believe that it is necessary to extend this opinion as to the right of reliance of the plaintiffs upon other frauds claimed to have been practiced by the defendant.

The judgment of the trial court is affirmed.

Neither party shall recover costs.