Argued and submitted September 12, 2011, reversed and remanded
July 25, 2012

## Larry MURPHY,
*Plaintiff-Appellant,*

*v.*

## ALLSTATE INSURANCE COMPANY,
a property and casualty insurance company,
*Defendant-Respondent.*

### Josephine County Circuit Court
09CV0373; A145874

284 P3d 524

Lee S. Werdell argued the cause and filed the briefs for appellant.

Robert S. May argued the cause for respondent. With him on the brief were Chin See Ming and Smith Freed & Eberhard, PC.

Before Armstrong, Presiding Judge, and Haselton, Chief Judge, and Duncan, Judge.

ARMSTRONG, P. J.

## ARMSTRONG, P. J.

Plaintiff brought this fraud action against defendant, alleging that he had relied on statements by one of defendant's claims adjusters in entering a contract with a contractor for repair work on plaintiff's rental property and, as a consequence, had been damaged by the contractor's failure to obtain the building permits necessary to perform the repairs and to make the repairs in conformance with the Grants Pass building code. The trial court granted defendant's motion for summary judgment on plaintiff's fraud claim on three grounds: plaintiff had not timely filed his claim; plaintiff had failed to adduce evidence on an element of fraud, *viz.*, that plaintiff's reliance on the claim adjuster's statements was justified; and plaintiff had failed to plead and to adduce evidence on the existence of a special relationship between himself and defendant that would entitle him to recover damages against defendant for fraud. Plaintiff appeals the general judgment, advancing two assignments of error that together challenge all three of the court's reasons for granting summary judgment.[1] Reviewing the facts in the light most favorable to him,[2] we agree with plaintiff that the court erred in granting summary judgment to defendant, and, therefore, we reverse and remand.

Plaintiff owns a residential rental property in Grants Pass that suffered extensive water damage on January 18, 2007. Pursuant to his homeowner's insurance policy with defendant, plaintiff filed a claim with defendant for the damage, and defendant accepted the claim and agreed to pay for the repairs. Roughly a week after the damage occurred, plaintiff met Gould, one of defendant's claims adjusters, and Stewart, a contractor who owns a company that performs restoration work and whom Gould

---

[1] Although plaintiff divides his challenge to the court's summary judgment ruling into two assignments of error, because assignments of error target rulings and not the reasons for the rulings, *Archambault v. Ogier*, 194 Or App 361, 366-67, 95 P3d 257 (2004), plaintiff actually advances only one assignment of error.

[2] On appeal of a grant of summary judgment, we review the record in the light most favorable to, and draw all reasonable inferences from the facts in favor of, the nonmoving party to determine whether there are any genuine issues of material fact and whether the moving party is entitled to judgment as a matter of law. *Jones v. General Motors Corp.*, 325 Or 404, 420, 939 P2d 608 (1997).

had invited to the property.[3] After the three men had walked around the house to survey the damage, Stewart presented plaintiff with a work-authorization contract and told him that he needed to sign it that day so that Stewart could begin the repair work and thereby prevent further water damage to the house. Gould told plaintiff that he agreed with Stewart that plaintiff should sign the contract to begin the repairs.

Before signing the contract, plaintiff asked Gould and Stewart whether Stewart's proposed repair work would require building permits, pointing out that it seemed to plaintiff that the job would require electrical permits because water had damaged light fixtures in the ceiling of the house. Specifically, plaintiff asked Gould, "[D]o we need any permits to do this job and do it right so we can get it done?" Gould responded, "No, we don't," and Stewart added, "No, we don't need any, it's just a normal restoration job, water damage." Also, at some point during the initial inspection of the home, Gould told plaintiff, regarding Stewart's qualifications, that defendant "use[s] [Stewart] quite often here in town and other places on all our jobs."[4] Plaintiff then signed the work-authorization contract.

During the course of Stewart's ensuing repair work, the issue whether the work had to be performed pursuant to building permits came up twice. First, plaintiff testified at his deposition that he had had a meeting with a Grants Pass building inspector about the need for some type of building permit "probably within a few months" of Stewart's initial inspection of the house on January 25, 2007.[5] Second, after Stewart had found weaknesses in the house's foundation that would need to be repaired to install new flooring and had told Gould about the issue, Gould and plaintiff went to the house to assess the foundation problem, and, according to plaintiff, Gould told

---

[3] For convenience, we refer to Stewart and his company, Stewart Restoration Services, LLC, as Stewart throughout this opinion.

[4] In an affidavit, plaintiff also asserted that Gould told him that Stewart was "very knowledgeable and [an] expert in reconstruction and repair work." However, the affidavit does not specify whether Gould made that statement before or after the initial inspection.

[5] The summary judgment record does not disclose any other details about that meeting.

"Stewart to fix the subflooring and the stringer in the house. [Gould said,] 'Whatever it takes, just do it, get it done.'

"And he looked right at me, and I said, '[Gould], now we are going to have to have a permit.'

"And he goes, 'No, we don't need [a] permit.' He says, 'We are not doing any structural changes.'

"I said, '[Gould], you are up, underneath the floor, you are lifting the main frame of the house, you are building this header, you don't need any?'

"He says, 'No, they are just going to put a couple pier blocks, that's it, I'm gone.'"

Plaintiff also asked Stewart during the meeting if a building permit would be needed to perform the work, and Stewart told him that a permit would not be necessary. However, plaintiff testified that he still had his doubts.[6]

Stewart completed the work in May 2008, but, at some point after October 1, 2008, a Grants Pass building inspector told plaintiff that he believed that substantial portions of the repair work that Stewart had performed required a building permit. On February 11, 2009, the Grants Pass building safety department issued a notice to plaintiff that asserted that the restoration work had violated the city building code because it had been performed without the required building permits. As a result of the violation, no one could occupy the property and plaintiff had to pay a fine of $495 per day for a period that started on February 2 and ended when plaintiff obtained the required permits, if he did so within 14 days of the notice.

Plaintiff filed this action against defendant for fraud on April 13, 2009, alleging that he had relied on Gould's false statements—*viz.*, that no building permits were required for the repair work and that Stewart was experienced in and knowledgeable about restoration work—in signing the work-authorization contract with Stewart, which resulted in the noncomplying repair work. Plaintiff sought damages

---

[6] Inexplicably, the record does not disclose the specific, or even an approximate, date on which the exchange between plaintiff and Gould took place.

on his fraud claim as follows: (1) roughly $90,000 for the cost to correct Stewart's work on the property to bring it into compliance with the building code; (2) the amount of the penalty imposed by the Grants Pass building department for building code violations; and (3) an amount for lost rental income.

Defendant moved for summary judgment in its favor on plaintiff's claim on, as pertinent to this case, three grounds. First, defendant contended that plaintiff's claim, which he filed on April 13, 2009, is time barred by the applicable two-year statute of limitation, ORS 12.110(1), because, under the discovery rule incorporated in the statute, plaintiff should have discovered "at least within three months of entering into [the] contract with Stewart," *viz.*, by April 25, 2007, that Gould's statements were fraudulent—at which point the two-year limitation period would have commenced.[7] Second, defendant contended that the evidence adduced by plaintiff was insufficient to prove that plaintiff's reliance on Gould's statements in entering the contract with Stewart was justified—an essential element of fraud. Finally, defendant argued that Gould's allegedly fraudulent statements were made in the course of defendant's performance of its obligation under the insurance contract to pay for the repair work, and, therefore, plaintiff cannot recover on any tort claim— as opposed to a contractual claim based on defendant's breach of the insurance contract—without proving a special relationship between defendant and himself that gives rise to a standard of care independent of the duty imposed by the terms of the contract, which plaintiff had not proved. The court granted summary judgment on each of those grounds, and, therefore, we address each in turn, beginning with the statute of limitation.

---

[7] Because plaintiff filed his claim on April 13, 2009, if the two-year limitation period started to run three months after the January 25, 2007, date that plaintiff entered into the contract with Stewart—*viz.*, on April 25, 2007—then the claim would have been timely filed. Therefore, taken literally, defendant's statute of limitation argument fails by its terms. However, we give defendant the benefit of the doubt and assume that it was attempting to argue that plaintiff should have discovered the fraud, thereby triggering the two-year limitation period, before April 13, 2007.

## I. STATUTE OF LIMITATION

A fraud action must be commenced within two years of the date on which the cause of action accrues. ORS 12.010; ORS 12.110(1).[8] To determine when a fraud claim accrues, ORS 12.110(1) incorporates a discovery rule, which operates in conjunction with the general claim-accrual principle that applies to all claims—*viz.*, that a claim accrues when all of the facts exist that the plaintiff must prove in order to recover on the claim. *Berry v. Branner*, 245 Or 307, 309, 315-16, 421 P2d 996 (1966); *see also Duyck v. Tualatin Valley Irrigation Dist.*, 304 Or 151, 161, 742 P2d 1176 (1987) ("A cause of action accrues when the party owning it has a right to sue on it."). The discovery rule in ORS 12.110(1) creates the following disjunctive test for fraud-claim accrual: a fraud claim accrues when the plaintiff has discovered facts *or*, in the exercise of reasonable diligence, should have discovered facts that would alert a reasonable person to the existence of the three elements of an actionable injury, which are (1) harm, (2) causation, and (3) tortious conduct—*viz.*, the alleged fraud. *See Gaston v. Parsons*, 318 Or 247, 256, 864 P2d 1319 (1994) (concluding—after equating the discovery rule in ORS 12.110(4) with the discovery rule in ORS 12.110(1)—that the limitation period under ORS 12.110(4) "begins to run when the plaintiff knows or in the exercise of reasonable care should have known facts which would make a reasonable person aware of a substantial possibility that each of the three elements (harm, causation, and tortious conduct) exists"); *Mathies v. Hoeck*, 284 Or 539, 542, 588 P2d 1 (1978) ("[T]he period of limitations for fraud begins to run when the plaintiff knew or should have known of the alleged fraud.").[9]

---

[8] ORS 12.010 provides, "Actions shall only be commenced within the periods prescribed in this chapter, after the cause of action shall have accrued, except where a different limitation is prescribed by statute." ORS 12.110(1) provides:

"An action for assault, battery, false imprisonment, or for any injury to the person or rights of another, not arising on contract, and not especially enumerated in this chapter, shall be commenced within two years; provided, that in an action at law based upon fraud or deceit, the limitation shall be deemed to commence only from the discovery of the fraud or deceit."

[9] As we explained in *Widing v. Schwabe, Williamson & Wyatt*, 154 Or App 276, 283, 961 P2d 889 (1998):

"The discovery rule [under ORS 12.110(1)], as it applies to the fraud claim, is essentially similar [to the discovery principle laid out in *Gaston* incorporating

The overarching inquiry regarding the timeliness of plaintiff's claim is when should plaintiff have discovered that he had suffered an actionable injury resulting from Gould's alleged fraud—which is a determination that must be made by the factfinder unless the evidence compels a certain answer as a matter of law. *See, e.g., Mathies*, 284 Or at 543.[10] The resolution of that overarching inquiry depends on two predicate determinations: (1) when, if ever, plaintiff learned sufficient facts that should have aroused his attention about the possibility of fraud such that he had a duty to undertake further investigation and (2) if plaintiff had a duty to investigate, when a reasonable investigation would have provided him with sufficient facts to disclose the existence of an actionable injury. *See id.* (setting out framework); *see also Greene v. Legacy Emanuel Hospital*, 335 Or 115, 123, 60 P3d 535 (2002) ("[T]he period of limitations would commence [under the discovery rule in ORS 12.110(4)] at some later point when, after inquiry, the facts reasonably should disclose the existence of an actionable injury.").

Accordingly, our analysis begins with the predicate inquiry whether the evidence in the record presents a factual issue about whether, during the roughly two and one-half months between the day that Gould made the allegedly fraudulent statements about the building permits and Stewart's qualifications and the outer limit of the two-year limitation period—*viz.*, between January 25, 2007, and roughly April 13, 2007—plaintiff learned sufficient facts to trigger a duty to investigate Gould's alleged fraud.

Based on the record, there were two occasions during that time that the issue of building permits came to plaintiff's attention.[11] The first was plaintiff's meeting with

the three elements of an actionable injury], except that the actual or [imputed] knowledge that a plaintiff must have in order to start the running of the statute has sometimes been described as including the fact of the fraud itself."

[10] The record establishes that plaintiff had actual knowledge that he had suffered an actionable injury within two years of his April 13, 2009, filing of the claim.

[11] On appeal, defendant argues, in essence, that plaintiff should have discovered that he had suffered an actionable injury at the point that Gould made the allegedly fraudulent statements because plaintiff at that point questioned whether permits were needed. However, the premise of defendant's argument—*viz.*, that plaintiff should have investigated whether permits were needed "so that

a Grants Pass building inspector. Although plaintiff testified that the meeting concerning building permits occurred "probably within a few months" of the initial inspection on January 25, 2007, during which Gould had first told plaintiff that no building permits were needed for the job, the testimony leaves two factual issues unresolved: (1) whether plaintiff's "within a few months" estimate means that the meeting occurred during the relevant two and one-half month time period between January 25 and April 13, 2007, and (2) whether what plaintiff learned at the meeting would have caused a reasonable person to undertake further investigation, if a further investigation would even have been needed. The second event was the meeting at the house among Gould, Stewart, and plaintiff to discuss the foundation issues. The evidence about that meeting leaves unresolved the same factual issues about the meeting with the building inspector—*viz.*, whether it took place within the relevant time period and whether it would have caused a reasonable person to investigate further. Accordingly, at the least, there are factual issues concerning when the events during which plaintiff may have learned sufficient facts to trigger a duty to investigate occurred.

Therefore, we conclude that the determination whether plaintiff should have discovered that he had suffered an actionable injury as a result of Gould's allegedly fraudulent statements is one that must be made by the jury, and, accordingly, the court erred in granting summary judgment on the ground that plaintiff's claim was not timely.

## II.   PLAINTIFF'S JUSTIFIABLE RELIANCE

We turn to the court's conclusion that the evidence proffered by plaintiff failed to establish that plaintiff's reliance on Gould's statements was justified—that is, that plaintiff had a right to rely on the statements. To recover on a fraud claim, a plaintiff must prove the following elements:

---

he need not have relied on Gould's statement[s]"—speaks to whether plaintiff justifiably relied on the statements, not whether plaintiff should have discovered, after relying on them, that the statements were fraudulent. Therefore, we address that argument in our analysis of whether the court erred in granting summary judgment on the ground that plaintiff had failed to adduce evidence to prove that his reliance was justified.

"the defendant made a material misrepresentation that was false; the defendant did so knowing that the representation was false; the defendant intended the plaintiff to rely on the misrepresentation; the plaintiff justifiably relied on the misrepresentation; and the plaintiff was damaged as a result of that reliance."

*Strawn v. Farmers Ins. Co.*, 350 Or 336, 352, 258 P3d 1199, *adh'd to on recons*, 350 Or 521, 256 P3d 100 (2011), *cert den*, ___ US ___, 132 S Ct 1142, 181 L Ed 2d 1017 (2012). The requirement that a plaintiff's reliance be justified serves as a balance between, on the one hand, the policy that a person who intentionally deceives another should not be allowed to profit from the deception and, on the other hand, the recognition that the person deceived, as an autonomous individual, should be responsible for protecting his or her own interests when making a decision.[12] Consequently, to satisfy the element, a plaintiff must have exercised reasonable diligence, in the totality of the circumstances, to assess the truth of the allegedly fraudulent statements before acting in reliance on them. *See Johnson et ux v. Cofer*, 204 Or 142, 150, 281 P2d 981 (1955) ("[T]he right to rely on representations presents the question of the duty of the party to whom the representations have been made to use diligence in respect to those representations."); *OPERB v. Simat, Helliesen & Eichner*, 191 Or App 408, 428, 83 P3d 350 (2004) ("Reliance in fact must be reasonable, but such reasonableness is measured in the totality of the parties' circumstances and conduct."). Put another way, the determination whether a person's reliance on a fraudulent statement was justified typically hinges on the extent to which the plaintiff had a duty to investigate the truth of the statement.

---

[12] *See Johnson et ux v. Cofer*, 204 Or 142, 150, 281 P2d 981 (1955) ("The policy of the courts is, on the one hand, to suppress fraud and, on the other, not to encourage negligence and inattention to one's own interests. The rule of law is one of policy. Is it better to encourage negligence in the foolish, or fraud in the deceitful? Either course has obvious dangers. But judicial experience exemplifies that the former is the less objectionable and hampers less the administration of pure justice. The law is not designed to protect the vigilant, or tolerably vigilant, alone, although it rather favors them, but is intended as a protection to even the foolishly credulous, as against the machinations of the designedly wicked. It has also been frequently declared that as between the original parties, one who has intentionally deceived the other to his prejudice is not to be heard to say, in defense of the charge of fraud, that the innocent party ought not to have trusted him or was guilty of negligence in so doing." (Internal quotation marks omitted.)).

There are two circumstances in particular on which Oregon courts have focused to make that determination. The first is the ability of the plaintiff to obtain information that would reveal the truth of the fraudulent statement— that is, the difficulty that a plaintiff would encounter in conducting an independent investigation of the truthfulness of the statement. *See Miller et ux v. Protrka et ux*, 193 Or 585, 597, 238 P2d 753 (1952) (explaining that purchasers did not justifiably rely on the statements of sellers where "the prospective buyers have or can obtain equal means of information" to discern their truth); *see also Rosboro Lumber Co. v. Apsel*, 144 Or App 298, 303-04, 926 P2d 329 (1996), *adh'd to as modified on recons*, 146 Or App 333, 932 P2d 110 (1997), *rev dismissed*, 326 Or 530 (1998) ("Whether the parties have or can obtain equal means of information, in turn, depends on whether it would be unreasonably difficult under the circumstances for the party to whom the representations have been made to perform an independent investigation." (Internal quotation marks omitted.)). The second circumstance is the relative sophistication of the parties—that is, whether the parties are equally capable of evaluating certain facts about the statements. *Miller*, 193 Or at 597; *see also OPERB*, 191 Or App at 428 ("For example, if there is a naive and unsophisticated plaintiff on one side of the equation and an unscrupulous defendant who made active misrepresentations of fact on the other, a court might well conclude that, although a more sophisticated party would not have taken at face value the false representations of the defendant, *that* particular plaintiff was justified in doing so." (Emphasis in original.)).

Here, the critical inquiry is whether plaintiff had a duty to investigate the truth of Gould's statements before plaintiff signed the work-authorization contract with Stewart in reliance on them—a determination that must be made by the factfinder unless the circumstances of the case compel the conclusion that plaintiff was not justified, as a matter of law, in so relying. *See, e.g., Soursby v. Hawkins*, 307 Or 79, 86, 763 P2d 725 (1988).

Three circumstances are pertinent to our analysis: (1) the availability of information about the need for building permits and about Stewart's qualifications; (2) the relative

sophistication of plaintiff and Gould; and (3) the pressure on plaintiff to sign the contract with Stewart almost immediately after Gould made the allegedly fraudulent statements.

First, the information that would reveal the truth of Gould's statements was undoubtedly available; it was not exclusively in Gould's control, and plaintiff certainly could have asked a city building inspector about the permit issue, which he eventually did as the work was progressing, and could have asked other clients or contractors in the area about Stewart's qualifications to perform the restoration work. However, despite the general availability of the information, a jury could still reasonably infer that the information would have been unduly difficult to acquire and, therefore, that plaintiff need not have sought the information in order to justifiably rely on Gould's statements. *See Soursby*, 307 Or at 87-88 (concluding that "purchasers may rely on representations if discovering the truth would be unreasonably difficult" and, in the context of the specific circumstances of the case, "[d]iscovering the zoning restrictions on the property could involve a complex and difficult search, particularly for buyers who are unfamiliar with the process").

Second, as to the relative sophistication of the parties, plaintiff testified at his deposition that he had asked Gould about the need for building permits because he had assumed that Gould, having been trained as a claims adjuster, would be familiar with that issue and would know the answer and that he had asked Gould about Stewart's qualifications because Gould had brought him to the house to assess the water damage. Both statements could be taken to show that Gould was the more sophisticated party. However, plaintiff also testified that he had worked for most of his life as a construction worker, building dams and installing drywall depending on the time of year, and, based on his experience in that field, he knew that some construction projects require building permits. The jury could reasonably infer that plaintiff's construction experience makes him a sophisticated party regarding the subject of Gould's statements or it could reach the opposite inference based on the fact that nothing in the record suggests that plaintiff ever had to assess the need for building permits or had to obtain them as part of his construction employment.

Finally, and most importantly, plaintiff testified that both Gould and Stewart had exerted pressure on him to sign the work-authorization contract immediately to prevent further water damage to the house that would result were he to delay doing that. A jury could certainly infer that the pressure to sign the contract created a situation in which, no matter how available the information revealing the truth of Gould's statements or how sophisticated the parties, plaintiff simply could not be said to have had any opportunity to conduct an independent investigation before signing the contract.

Therefore, we conclude that the question whether plaintiff reasonably should have investigated the need for building permits and Stewart's qualifications before signing the work-authorization contract must be answered by the jury. Accordingly, the court erred in granting summary judgment in defendant's favor on the ground that plaintiff had not adduced sufficient evidence to demonstrate that he justifiably relied on Gould's statements.

### III. SPECIAL RELATIONSHIP

Finally, we turn to the court's conclusion that, because plaintiff and defendant were parties to an insurance contract, plaintiff could not recover on his fraud claim without pleading and adducing evidence that he had a special relationship with defendant giving rise to a standard of care independent of the one imposed by the contract's terms. As the Oregon Supreme Court has routinely stated in addressing a plaintiff's choice between tort and contract remedies:

> "When the relationship involved is between contracting parties, and the gravamen of the complaint is that one party caused damage to the other by *negligently* performing its obligations under the contract, then, and even though the relationship between the parties arises out of the contract, the injured party may bring a *claim for negligence* if the other party is subject to a standard of care independent of the terms of the contract. If the plaintiff's claim is based solely on a breach of a provision in the contract, which itself spells out the party's obligation, then the remedy normally will be only in contract, with contract measures of damages and contract statutes of limitation. That is so whether the

breach of contract was negligent, intentional, or otherwise. In some situations, a party may be able to rely on either a contract theory or a tort theory or both."

*Georgetown Realty v. The Home Ins. Co.*, 313 Or 97, 106, 831 P2d 7 (1992) (emphasis added). The court's focus on negligence claims is deliberate because the difficulty that the court addressed in reconciling tort and contract remedies concerns the source—contract or otherwise—that provides the applicable standard of care. Typically, if the contracting parties are in a special relationship, then the relationship serves as the source. *Abraham v. T. Henry Construction, Inc.*, 350 Or 29, 39-40, 249 P3d 534 (2011). However, although the source of the standard of care is a crucial consideration for negligence claims, it is not an issue for intentional tort claims, including fraud.

Therefore, and in the absence of case law extending the principle stated in *Georgetown Realty* to intentional torts,[13] we conclude that the court erred in granting summary judgment to defendant on the ground that plaintiff needed to adduce evidence to establish a standard of care independent of the terms of the insurance contract.

In conclusion, the court granted summary judgment to defendant on three grounds. We conclude that each of the grounds is insufficient to support the court's decision. Accordingly, we reverse and remand the general judgment.

Reversed and remanded.

---

[13] Defendant's contrary argument is unavailing. Specifically, defendant seizes on the use of the word "intentional" in the above-quoted portion of *Georgetown Realty* and contends that the court's use of that word "necessarily connotes that the torts to which the rule applies include intentional torts." However, the word "intentional" plainly refers to an intentional breach of a contract, not an intentional tort, and, therefore, the court's use of the word provides no support for defendant's argument.