239

Argued and submitted March 13, reversed and remanded on fraud claim and hostile work environment claim; otherwise affirmed December 26, 2013

Cynthia K. McNEFF,
an individual,
*Plaintiff-Appellant,*

*v.*

Terry W. EMMERT
and Emmert Industrial Corp.,
an Oregon corporation,
*Defendants-Respondents.*

Multnomah County Circuit Court
080812489; A148817

317 P3d 363

John M. Berman argued the cause and filed the briefs for appellant.

Judy Danelle Snyder argued the cause for respondents. With her on the brief was Robert Snee.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Duncan, Judge.

SCHUMAN, P. J.

## SCHUMAN, P. J.

Plaintiff Cynthia McNeff was hired by defendant Terry Emmert to work as in-house legal counsel for his company, Emmert Industrial Corp. (EIC), which is also a defendant in this case. Less than a year into the job, plaintiff was fired. She subsequently brought breach of contract, tort, and employment discrimination claims against defendants. In response, defendants counterclaimed for fraud, breach of contract, and malpractice.

After the parties presented their cases, the trial court directed a verdict against plaintiff on her breach of contract and fraud claims and sent the remainder of her claims to the jury. On one of plaintiff's claims (defamation), the jury found in her favor and awarded damages of $1,000 against each defendant. On several other claims (intentional infliction of emotional distress, assault and battery, and wrongful discharge), the jury returned a defense verdict. And on her final claim (workplace discrimination based on a hostile work environment), the jury returned something of a hybrid verdict: The jury found that defendants had discriminated against plaintiff "on account of gender by creating a hostile work environment" and should be punished by an award of punitive damages; yet the jury answered "$0.00" when asked to award noneconomic damages on that claim. The trial court declined to resubmit the verdict form to the jury, instead treating the jury's answer of "$0.00" in damages as a verdict for the defense.

As for the counterclaims by defendants, the jury found that plaintiff had been negligent in handling a number of matters in her role as legal counsel but that her negligence had resulted in a loss to defendants in only one of those matters. The damages for that malpractice, which the jury concluded were $371.00, were further reduced to $241.15 by the jury's finding that Emmert's own negligence caused 35 percent of the loss. The trial court then entered a money judgment in favor of plaintiff in the amount of $1,758.85— her $2,000 recovery for defamation, less the offsetting malpractice award of $241.15. The court later entered a supplemental judgment concerning an award of costs.

Plaintiff now appeals the judgment and supplemental judgment, raising four assignments of error. We write to address two of those assignments of error. In her first assignment, she argues that the trial court erred in taking her fraud claim away from the jury by way of a directed verdict. In her third assignment, she contends that the jury's verdict regarding a hostile work environment was internally inconsistent and should have been sent back to the jury for clarification. As discussed below, we conclude that the judgment must be reversed and remanded for a new trial on plaintiff's fraud and hostile work environment claims.[1]

## I. FRAUD CLAIM

A. *Background*

In plaintiff's first assignment of error, she argues that the trial court erred in directing a verdict against her on her fraud claim. In this posture, we state the facts underlying that claim in the light most favorable to plaintiff. *See Mauri v. Smith*, 324 Or 476, 479, 929 P2d 307 (1996) (describing the standard for review of a directed verdict).

In December 2006, plaintiff attended a holiday party put on by a group of lawyers. At the time, plaintiff was licensed to practice law but was not making her living as a lawyer. Rather, she was managing a small demolition company that she had opened and run since 2000. At the holiday party, plaintiff struck up a conversation with another attorney, Ken Bauman, who was retiring from the United States Attorney's Office. She and Bauman talked about his career and also about her experience running a demolition company.

Bauman, it turned out, was a longtime friend of Terry Emmert. In early 2007, after his retirement, Bauman began working in an advisory capacity for Emmert and EIC, his industrial moving company that transports houses, equipment, and other large items. After observing EIC's operations, Bauman decided that EIC would benefit from hiring another lawyer, and he suggested to Emmert that

---

[1] In her remaining assignments of error, plaintiff challenges the trial court's cost award and its refusal to direct a verdict against a malpractice counterclaim against her. We reject those contentions without discussion.

plaintiff, with whom Bauman had stayed in contact, might be a good fit because of her dual background in the law and industry. (In addition to running a demolition company, plaintiff had worked as an environmental health technician and an industrial hygienist technician.) Bauman arranged a meeting, and the three of them had lunch together.

The lunch meeting resembled a job interview. Emmert asked plaintiff about her experience and her thoughts about legal work. Mostly, though, Emmert voiced complaints about his present attorneys (Bauman excluded) and his dissatisfaction with their performance. After the lunch, Emmert wanted to show plaintiff some of his business operations, and he took her to some of his facilities.

Following the lunch meeting, Emmert and plaintiff continued a dialogue about the possibility of her working for Emmert. One evening, Emmert called plaintiff and "suggested that [she] come over and chat with him about this job that he was offering [her]." During that meeting at Emmert's home, they had "some more in-depth conversations about what [Emmert] needed and what he wanted and his—a lot about his dissatisfaction with things that were going on with his business."

As they continued to discuss a job offer, plaintiff "told [Emmert] that in order to work for him, [she] would have to close [her] demolition company." At that particular time, plaintiff was also starting another company to install solar panels on commercial buildings, and she had started the licensing process for that type of work. She explained her plans to do solar work to Emmert and told him, "[I]f I was going to go to work for him and—and let these things go, I wasn't going to do this without any type of guarantee of employment." Emmert replied that he understood that.

During that same discussion about guaranteed employment, plaintiff and Emmert discussed her desire for a written contract. She told Emmert that, if she were "going to give up these companies to go work for you, I would need something—something in writing that stated that I would have an employment contract for term because of the risk involved of closing my companies." Emmert told plaintiff to

send the contract to him through Bauman, so that Emmert's present in-house counsel, Michele Matesi, would not see it.[2]

Plaintiff sent a proposed contract to Bauman and then called him to discuss it. Bauman recommended that plaintiff delete the terms of the contract regarding a holiday schedule and benefits package, and to instead provide that those terms of employment will be "per company manual." Plaintiff made those changes and then sent the contract back to Bauman, for him to forward it on to Emmert. The proposed contract, entitled "Employment Agreement," stated that plaintiff was to be employed for a period of 36 months[3] and that her compensation would start at $8,850 per month and then increase each of the next two years of the contract.

At some point before she started work, plaintiff and Emmert had a phone conversation about the terms of the proposed contract. Emmert questioned why plaintiff would be receiving a significant raise each year, and plaintiff explained that she would become more valuable as she learned the company and became more efficient and useful. Emmert was satisfied with that answer, saying, "Well, that sounds reasonable." He did not question any of the other provisions in the proposed contract. He told plaintiff that "everything else looks good," which plaintiff understood to mean that he agreed with all the terms.

During their final conversation before she started her employment with EIC, plaintiff and Emmert again discussed the written contract and the logistics of getting it signed. Emmert told her to bring the contract with her when she came to work, and plaintiff did so. On June 23— two days before plaintiff started work—Emmert received a message from Matesi advising him not to "sign any sort of Contract WHATSOEVER with this new attorney, promising her ANYTHING. She is a regular full-time employee. Tell her you don't do 'employment contracts' or whatever.

---

[2] Matesi was a member of the Washington State Bar but was not licensed in Oregon. Her official position was "legal administrator" for defendants.

[3] Although the document at one point states that "[t]he term of this contract will be for 36 months," it later provides that "[t]he term of employment shall begin 25 June 2007 and extend to 26 July 2010"—a period of 37 months.

Just PLEASE PLEASE don't sign anything." (Uppercase in original.) When plaintiff arrived for her first day of work on June 25, 2007, she went into Emmert's office and handed him the contract. Emmert told her, "I'll get to it later. I'm a little busy right now."

Neither Emmert nor plaintiff ever signed that or any contract to employ plaintiff as in-house counsel.[4] Emmert testified at trial that he never agreed to a three-year contract and never would have entered into a written employment agreement. When asked whether he ever intended to honor a three-year term, Emmert testified:

> "I never had a meeting of the minds on any of the terms in there. I wouldn't sign a contract with anybody, number one. I wouldn't sign that I was going to pay somebody two years worth of wages if they didn't prove to be successful or couldn't do the job after two months."

Despite the lack of a signed agreement, plaintiff started her employment with EIC at the same monthly pay set forth in the agreement, and she wound down her solar energy and demolition work. After starting her employment, she signed an acknowledgement stating that she agreed to be bound by the terms of EIC's employee handbook. She also signed an application for employment that stated, "I also understand and agree that no representative of the company has any authority to enter into any agreement for employment for [any] period of time or to make any agreement contrary to the for[e]going unless it is in writing and signed by an authorized company representative."

The relationship between plaintiff and Emmert deteriorated quickly. Within a few months, Emmert was complaining about the quality of plaintiff's work and the number of hours that she was working. On March 14, 2008, plaintiff, in response to some of those complaints, sent an e-mail stating, among other things, that "[m]y employment agreement was my hours were from 7am to ~4 and that has been the standard for the last 8 months. I have not and did not and do not agree to change these hours. A deal is a deal."

---

[4] Plaintiff testified that she expected to sign the agreement contemporaneously with Emmert, but that the signing never occurred.

Four days later, Emmert sent a memorandum to plaintiff that stated, in part:

> "Prior to or just after you started working for Emmert Industrial Corporation you submitted a proposed employment contract to me for my review. Thereafter you and I have never discussed what would be a mutually agreeable terms of an employment contract. We never agreed on the terms of an employment contract and we never executed the proposed employment contract you submitted to me. After your email dated March 14, 2008 I again reviewed your employment contract proposal. Your proposal contains many provisions that were and are unacceptable to me. Your proposal contains terms which I have never agreed to in any other contract. As an example; your proposed employment contract has guaranteed pay increases in your compensation of 06.27% in your second year and 14.99% in your third year. I did however, note with interest that even your proposed employment contract did not set out your hours of work. You did agree to be bound by the company policies and procedures (evidenced by your signature on the form acknowledging your receipt of and agreement to be bound by) outlined in the employee handbook. Under the employee handbook you are an exempt employee and as such I expect you to be here on the hours that I specify that you are needed. Like the company managers and other lawyers your work week will of necessity require more than 40 hours and you will be sometimes required that you work nights and weekends to get your job done."

Less than two weeks later, on March 31, 2008, plaintiff was terminated from her position.

### B. *Analysis*

In her fraud claim,[5] plaintiff alleged that, "[i]n order to induce [her] to come to work for [defendants], and to give up her other business interests, [defendants] represented to [her] that they agreed to the terms of the contract she prepared and presented to them, and intended to perform in accordance with it." She further alleged that the

---

[5] Plaintiff alleged separate "counts" of breach of contract (Count 1) and fraud (Count 2) under her first claim for relief. Although defendants argue that the counts are inextricably linked, they allege distinct and alternative theories of recovery. The trial court treated them as separate claims for purposes of its ruling on the directed verdict, and we do the same.

representation was false and that defendants "did not intend to sign the agreement or to perform in accordance with said contract and made said false representation either intentionally or recklessly." Defendants eventually moved for a directed verdict on that claim, arguing that (1) plaintiff's reliance on any oral promise of an employment contract was unreasonable as a matter of law and (2) plaintiff had not alleged a "special relationship" between herself and defendants that would give rise to tort liability. The trial court granted the motion, stating, "On the second claim of fraud, I am convinced by defendants' arguments that this claim should be dismissed in its entirety."

On appeal, plaintiff argues that the evidence at trial was legally sufficient to establish the elements of fraud and that neither of the grounds raised by defendants—unreasonable reliance or the lack of a "special relationship"—was sufficient to defeat the claim as a matter of law. In response, defendants reprise the arguments they made below and add another—that plaintiff failed to prove that defendants had any fraudulent intent.

We begin by addressing defendants' arguments regarding plaintiff's purported failure to prove two of the elements of fraud. To establish a common-law fraud claim, a plaintiff must prove that

"the defendant made a material misrepresentation that was false; the defendant did so knowing that the representation was false; the defendant intended the plaintiff to rely on the misrepresentation; the plaintiff justifiably relied on the misrepresentation; and the plaintiff was damaged as a result of that reliance."

*Strawn v. Farmers Ins. Co.*, 350 Or 336, 352, 258 P3d 1199, *adh'd to on recons*, 350 Or 521, 256 P3d 100 (2011).

According to defendants, this is simply a case in which there was never a meeting of the minds regarding the terms of an employment contract, and the mere fact of nonperformance of a contract—one that never existed, for that matter—is not sufficient to prove that Emmert had any wrongful intent. *Cf. Holland v. Lentz*, 239 Or 332, 348, 397 P2d 787 (1964) ("A fraudulent intent not to perform a

promise may not be inferred as existing at the time the promise is made from the mere fact of nonperformance. Other circumstances of a substantial character must be shown in addition to nonperformance before such inference of wrongful intent may be drawn." (Internal citations and quotation marks omitted.)). However, plaintiff's fraud claim does not depend on a "meeting of the minds"—in fact, it is predicated on the theory that Emmert had in mind something very different from what he communicated to plaintiff, and from what she understood. And, viewed in the light most favorable to plaintiff, there is evidence in the record to support that theory. Plaintiff testified that, before she started her employment at EIC, Emmert indicated that he understood her need for a three-year contract, stated that the proposed three-year contract was acceptable, and told her to bring the contract with her to work for him to sign. And yet, there is evidence—Emmert's own testimony—that he would never have intended to enter into an employment contract with a new employee, particularly a multiyear deal, as well as an e-mail from EIC's then-counsel warning Emmert not to put anything in writing. That evidence, coupled with Emmert's conduct when plaintiff arrived—putting off signing the contract, then later denying that any agreement had been reached—would permit a reasonable juror to find that Emmert promised to enter into a three-year employment contract to induce plaintiff to accept an offer as in-house counsel, but that he never had any intention of performing that promise.

Alternatively, defendants contend that, even if there were a misrepresentation regarding future employment terms, plaintiff cannot prove that she justifiably relied on that promise. They submit that plaintiff was a licensed attorney and sophisticated businessperson; thus, her reliance on Emmert's promises "is not a reasonable reliance when all of the essential terms of the proposed contract have not been discussed and agreed upon." Moreover, they argue that, because plaintiff's proposed contract provided that the written agreement would supersede oral or written agreements, she "cannot claim that she reasonably relied on any alleged prior agreement between the parties." Neither of those arguments is persuasive. As for the former, viewing the evidence in the

light most favorable to plaintiff, the essential terms were discussed and agreed upon—or, at least Emmert *told* plaintiff that he had agreed to the terms. As for the latter, we cannot imagine what principle of law would permit a party to fraudulently promise to execute a contract that includes an integration clause, and then rely on a provision of that unexecuted agreement to defeat the fraud claim.[6] The reasonableness of plaintiff's reliance on Emmert's promise to execute the proposed employment agreement was a question for the jury. *See Cocchiara v. Lithia Motors, Inc.*, 353 Or 282, 298, 297 P3d 1277 (2013) (describing the subjective and objective components of reliance and further explaining that "the type of interest protected by the law of deceit is the interest in formulating business judgments without being misled by others—in short, in not being cheated" (citation omitted)).

We turn, lastly, to defendants' contention that plaintiff's fraud claim is barred by the absence of a "special relationship" between defendants and plaintiff. Defendants argue:

> "To obtain relief in tort for fraud associated with a contract, a duty 'must exist *independent of the contract and without reference to the specific terms of the contract ***.* [T]hat duty in tort does not arise from the terms of contract, but from the nature of the parties' relationship.' *Conway v. Pacific University*, 324 Or 231, 237-38, 924 P2d 818 (1996), citing *Georgetown Realty v. The Home Ins. Co.*, 313 Or 97, 106, 831 P2d 7 (1992) (emphasis in original)."

Plaintiff responds that the "special relationship" rule expressed in cases like *Conway* and *Georgetown Realty* applies only to negligence claims, not to intentional torts like fraud.

Plaintiff is correct. As we explained in *Murphy v. Allstate Ins. Co.*, 251 Or App 316, 284 P3d 524 (2012), it is

---

[6] Defendants also appear to argue that plaintiff, having signed, during the course of her employment, documents in which she both agreed to be bound by EIC's employment manual and acknowledged that any employment agreements must be in writing, can no longer claim reliance on Emmert's pre-employment representations. Suffice it to say that plaintiff's later, post-employment conduct is not conclusive as to whether she was fraudulently induced to leave her previous companies and join Emmert and EIC.

not by coincidence that *Conway* and other "special relation-ship" cases involve negligence rather than intentional torts:

> "The court's focus on negligence claims is deliberate because the difficulty that the court addressed in recon-ciling tort and contract remedies concerns the source—contract or otherwise—that provides the applicable stan-dard of care. Typically, if the contracting parties are in a special relationship, then the relationship serves as the source. *Abraham v. T. Henry Construction, Inc.*, 350 Or 29, 39-40, 249 P3d 534 (2011). However, although the source of the standard of care is a crucial consideration for negli-gence claims, it is not an issue for intentional tort claims, including fraud.

> "Therefore, and in the absence of case law extending the principle stated in *Georgetown Realty* to intentional torts, we conclude that the court erred in granting summary judgment to defendant on the ground that plaintiff needed to adduce evidence to establish a standard of care indepen-dent of the terms of the insurance contract."

251 Or App at 328 (footnote omitted).[7]

In sum, we conclude that none of the grounds advanced by defendants is sufficient to defeat plaintiff's fraud claim as a matter of law. Thus, the trial court erred in granting the motion for a directed verdict on that claim, and we reverse and remand the judgment in that regard.

## II. HOSTILE WORK ENVIRONMENT

As part of her workplace discrimination claim, plaintiff contended that Emmert had created a hostile work

---

[7] In arguing that a "special relationship" is required even for intentional torts, defendants rely on the following language from *Georgetown Realty*, 313 Or at 106: "If the plaintiff's claim is based solely on a breach of a provision in the contract, which itself spells out the party's obligation, then the remedy normally will be only in contract, with contract measures of damages and contract statutes of limitation. That is so whether the breach of contract was negligent, *intentional*, or otherwise." (Emphasis added.) In a footnote in *Murphy,* we explained that such reliance is misplaced:

> "[D]efendant seizes on the use of the word 'intentional' in the above-quoted portion of *Georgetown Realty* and contends that the court's use of that word 'necessarily connotes that the torts to which the rule applies include inten-tional torts.' However, the word 'intentional' plainly refers to an intentional breach of a contract, not an intentional tort, and, therefore, the court's use of the word provides no support for defendant's argument."

251 Or App 328 n 13.

environment on the basis of her gender, thereby violating Oregon antidiscrimination law. *See generally* ORS 659A.030(1)(a), (b). Plaintiff sought both noneconomic and punitive damages on that claim, but the trial court bifurcated the proceedings so that the amount of any punitive damages award would be determined in a later proceeding, if necessary. Thus, with regard to the hostile work environment claim, the jury was instructed, in part:

> "The plaintiff also claims that the defendants discriminated against her by creating a hostile, intimidating or offensive work environment.
>
> "To recover, the plaintiff must prove of [*sic*] the following: Unwelcome verbal or physical conduct that is sufficiently severe or pervasive to have the purpose or effect of unreasonably interfering with work performance or creating a hostile, intimidating or offensive work environment; the defendants' offensive conduct occurred because plaintiff was female[;] *and the defendants' actions caused the plaintiff damages.*"

(Emphasis added.) With regard to punitive damages, the jury was instructed, in part, "If plaintiff prevails on one or more of her claims for intentional infliction of emotional distress, assault and battery or employment discrimination, then you must consider whether or not to award punitive damages."

The verdict form, in turn, posed the following questions:

> **"V. EMPLOYMENT DISCRIMINATION—DISPARATE TREATMENT/HOSTILE WORK ENVIRONMENT**
>
> "12. Did the Defendants discriminate against the Plaintiff on account of gender by creating a hostile work environment?
>
> "ANSWER:  Defendant Terry W. Emmert ___ (Yes or No)
> Defendant Emmert Industrial ___ (Yes or No)
>
> "If your answer is 'yes' to this question as to either Defendant, you must answer question 13 regarding non-economic damages.
>
> "13. What are Plaintiff's non-economic damages, if any, for employment discrimination-wrongful discharge and/or

employment discrimination - disparate treatment/hostile work environment?

> "ANSWER:  Defendant Terry W. Emmert ___
> Defendant Emmert Industrial ___
> The total may not exceed $250,000.

"14. Should Defendants also pay punitive damages for employment discrimination - disparate treatment/hostile work environment?

> "ANSWER:  Defendant Terry W. Emmert ___ (Yes or No)
> Defendant Emmert Industrial ___ (Yes or No)."

When the jury returned its verdict, it had answered "Yes" to Question 12, finding that both defendants had created a hostile work environment. On Question 13, the jury initially wrote "$1250" beside each defendant, then crossed out those numbers and wrote "$0.00" as the award of noneconomic damages. Although the jury did not award any noneconomic damages, it proceeded to answer "Yes" as to both defendants on Question 14, finding that they should be assessed punitive damages.

After the verdict was returned, defendants moved to dismiss the hostile work environment claim. They argued that, because the jury awarded no noneconomic damages, the hostile work environment claim should be dismissed and no further proceedings should be held to determine an amount of punitive damages. Plaintiff, for her part, objected to what she described as an inconsistency in the verdict. She argued:

> "Your honor, [the jury] also said, yes, that we established the claim that there was—they discriminated on her on behalf—on account of hostile work environment. * * * [I]f they said yes to the three elements [listed in the jury instruction] and no as to the amount, it's an inconsistent verdict at best.

> "Your honor, you need to so instruct them and ask them to confirm which it is they wish."

The trial court ruled that the verdict was not internally inconsistent and should be treated as a defense verdict. The court explained:

"I don't think that it's inconsistent and I think that it's clear and what they didn't understand is the legal issue with respect to whether or not you prevail on a claim for—I mean, they have—I mean, if we had bifurcated this completely and not put in the question of punitive damages, their answer would have been zero on damages. In which case, you [plaintiff] would not have prevailed on that claim.

"The fact that we know what their answer is on Question 14 is irrelevant. We don't even get to 14 unless you prevail on the issue of employment discrimination. So it's pretty clear to me."

The trial court, consistently with that reasoning, entered judgment dismissing plaintiff's hostile work environment claim.

On appeal, plaintiff argues that the trial court erred by entering judgment on an internally inconsistent verdict rather than resubmitting the claim to the jury. *See* ORCP 59 G(4) ("If the verdict is informal or insufficient, it may be corrected by the jury under the advice of the court, or the jury may be required to deliberate further."). We agree. The jury's verdict was internally inconsistent with regard to whether plaintiff suffered damages. On the one hand, the jury was instructed that, for plaintiff to prevail on her hostile work environment claim, it must find three elements, the last of which was that "the defendants' actions caused the plaintiff damages." It was further instructed to consider punitive damages if plaintiff were to prevail on her claim. By answering "Yes" to Questions 12 and 14, the jury indicated that plaintiff had in fact prevailed on the hostile work environment claim—*i.e.*, proved all the elements of the claim, including that defendants caused plaintiff damages. On the other hand, by answering "$0.00" to Question 13, the jury indicated that plaintiff had not suffered any damages, in which case the jury should not have considered the issue of punitive damages at all. *Building Structures, Inc. v. Young*, 328 Or 100, 113, 968 P2d 1287 (1998) (noting the general rule that a jury cannot award punitive damages on a fraud claim in the absence of an award of actual damages).[8] Given the internal inconsistency in the verdict, the court erred by

---

[8] In *Building Structures*, the defendant waived any objection to the inconsistency by not asking, as plaintiff did in this case, that the matter be sent back to the jury for clarification. *Id.* at 113-14.

entering judgment in favor of defendants; the proper course, under the circumstances, was to resubmit the claim to the jury for clarification. Thus, we reverse and remand the judgment with respect to the hostile work environment claim.

Reversed and remanded on fraud claim and hostile work environment claim; otherwise affirmed.